TENNESSEE COAL, IRON & RAILROAD
CO. v. MUSCODA LOCAL NO. 123 et al.

SLOSS-SHEFFIELD STEEL & IRON CO.
v. SLOSS RED ORE LOCAL NO. 109
et al.

REPUBLIC STEEL CORPORATION v. RAI-
MUND LOCAL NO. 121 et al.
No. 10278.

Circuit Court of Appeals, Fifth Circuit.

March 16, 1943.

Rehearing Denied July 27, 1943.

Borden Burr, E. L. All, S. M. Bronaugh, and Bernard A. Monaghan, all of Birmingham, Ala., for appellants.

Crampton Harris and Ralph W. Quinn, both of Birmingham, Ala., and J. A. Lipscomb, of Bessemer, Ala., for appellees.

Irving J. Levy, Associate Sol., Bessie Margolin, and Mortimer B. Wolf, Asst. Sol., U. S. Department of Labor, all of Washington, D. C., and William A. Lowe and Jerome A. Cooper, Regional Attys., U. S. Department of Labor, both of Birmingham, Ala., for administrator of Wage & Hour Division, U. S. Department of Labor, appellee.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

HOLMES, Circuit Judge.

These appeals are from a judgment declaring that the working time of underground iron-ore mining employees, comprising the work-week of such employees under Section 7 of the Fair Labor Standards Act of 1938,[1] includes time spent by them on the surface in checking in and out, obtaining and returning tools, lamps, and carbide, and time spent underground from the time they are required to report at the portal of the mine until they emerge therefrom at the end of their shift, less the fixed lunch period during which the employees are relieved of all duties; and declaring further that, since such aggregate working time exceeded the maximum work-week provided by said Act, appellants violated the Act in not compensating the employees as therein provided.

Appellants, corporations principally engaged in mining iron ore, filed separate civil actions under the Declaratory Judgments Act,[2] which were consolidated for trial, and as to which a single judgment was entered without objection. The actual controversy underlying federal jurisdiction related only to the hours of employment during the time intervening between the effective date of the Act, October 24, 1938, and the dates the respective petitions were filed in April, 1941. Upon a pre-trial conference it was agreed that the primary issue was what constituted the working time that made up the work-week of the underground ore-mining employees within the meaning of Section 7 of the Fair Labor Standards Act.

Section 7 of the Act requires every employer to pay overtime wages to any employee that is engaged in commerce or in the production of goods for commerce for a work-week longer than 44 hours between October 24, 1938, and October 23, 1939, longer than 42 hours between October 24, 1939, and October 23, 1940, and longer than 40 hours thereafter. The Act defines the word "employ" to include "to suffer or permit to work." § 3. It is without dispute that, during the period involved in this suit, each employee represented by appellees was engaged in the production of goods for commerce, and that each appellant required its underground employees to work 40 hours each week at their regular working places in the depths of the mine. Whether, in addition thereto, such employees were entitled under the Act to have included in the computation of their workweek the time consumed each week in travelling from the portal of the mine to their regular working places, and in returning therefrom to the portal at the end of the shift, plus the aggregate of the time consumed each week by such employees in checking in and out and obtaining and returning lamps, carbide, and tools on the surface, or whether they were entitled to

[1] 29 U.S.C.A. § 207, 52 Stat. 1060.

[2] 28 U.S.C.A. § 400.

have any part of such time included in the working time comprising the work-week, is the precise question for decision.

■■■ The Act was drafted for application on a national scale, and it does not undertake to define what is working time in any particular industry or class of industries. What constitutes working time is a question of fact depending upon the particular circumstances, and is a matter for the determination of the courts in controverted cases. In the great majority of instances no question of this nature will arise, but in doubtful cases such as this the issue must be determined in accordance with common sense and the general concept of work or employment; and, as in other cases, the appellate court is controlled by the rule that the finding of the trial court upon decisive questions of fact must be upheld unless it is clearly erroneous.

■■■ There is no real dispute as to the facts upon which the travel-time question turns, but different inferences as to the working time may fairly and reasonably be drawn from these facts. The parties on both sides of this controversy petitioned the court below to decide the controverted issues between them, i. e., to find the facts, declare the law, and enter a declaratory judgment accordingly. The jurisdiction of the court below and of this court having been rightfully invoked, we are compelled to decide the issue as to work-time without regard to what may be the result of an accounting between the parties. Courts should not consider the consequences of their legal decisions, except in trying to ascertain the legislative intent in enacting a statute of doubtful meaning; and, whatever may be said as to inferences from the facts, the law of this case is not doubtful. Moreover, no one can say at this time what will be the result of an accounting to be had in the future. We must limit our decision to the issues presented.

At the beginning of the shift the underground employees were required to report at the portal of the mine at a specified time, there to deposit their identification check at the tally office and to board the conveyance provided by the company for transportation to a man-unloading station inside the mine. The men rode in skips or ore cars, which were usually coated with grime of the mine, and assumed a crouched position to minimize the hazard of hitting their skulls against the low tunnel ceiling. Upon reaching the underground station the men left the skip and walked the remaining distance to their respective working places. They were obliged to exercise caution at all times to avoid contact with uninsulated electric wires and other hazards, and carried several pounds of equipment to be used in their work during the day. The men frequently were given instructions as to when and how they should perform their respective duties before the skips left the portal of the mine, and at all times during the descent they were subject to company rules and under company control. The return to the portal at the end of the shift was accomplished in the same manner and under the same conditions.

■■■ After considering these and other facts of a similar nature, the court below found as a fact that all of the time thus consumed was work-time and should have been included in the computation of the employees' work-week.[3] Since this travel-time was spent on the employer's premises and subject to its directions, since it exacted mental and physical exertion from the employees under conditions both hazardous and unhealthful, and since it was a course of action pursued solely as a necessary incident to the prosecution of the employer's business, we are unable to say that this finding of the court below was clearly erroneous.

■■■ Appellants contend that the industrial history and contractual course of dealing between the parties showed conclusively that travel-time in these iron-ore mines was not working time. It may be conceded, arguendo, that for twenty-five years prior to 1938 iron-ore miners had not been compensated for travel-time, and that even after 1938 the parties to this suit had entered into contracts whereby it was agreed that no wages should be paid for travel-time; but the very purpose of the Fair Labor Standards Act was to eliminate labor conditions detrimental to the general welfare of workers, and the remedial machinery set up to accomplish that purpose regulated hours of work and rates of pay. Industrial custom does not warrant the continuation of abuses that the Act was created to rectify; and no contractual agreement that compensation should not be paid for travel-time is valid if in conflict with the Act. The record discloses that

---

[3] Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123 et al., D.C., 40 F.Supp. 4.

this agreement was not a simple statement of admitted fact, but was a compromise adjustment of real differences reached by way of negotiation and concession, and that the workers, though vainly, insisted upon their right to be paid for travel-time.

With respect to time spent by employees checking in and out and procuring and returning tools, lamps, and carbide, the case stands differently. It appears that the workers were obliged to furnish their own tools, lamps, and carbide, and were free to exercise their own judgment as to when, where, and how they should procure their equipment. The company merely instructed them as to the equipment needed, and did not attempt further to regulate the matter. The checking system used by appellants required the employees only to deposit a metal disc at the tally house when arriving for work, and to pick it up again at the end of the shift. In addition to the practical difficulties incident to the computation of isolated moments so elusive in character, we think these pursuits should not be computed as work-time, since they fall within the category of duties incident to qualifying the employee to perform his work rather than within the scope of his actual employment.

Applying Section 7 of the Act to the facts of this case, we hold that the time spent by underground mining employees of appellants, from the time they were required to report and did report for work at the portal of the mine until they returned to the portal of the mine at the end of the shift, less the regular lunch period when they were relieved of all duties, constituted working time comprising the work-week; that appellants have not compensated said employees for some of said working time; and that reference of the cause to a master for calculation of amounts due said employees was proper.

It is ordered that the judgment appealed from be, and the same hereby is, modified so as to conform to our holding as to work-time. As so modified, the judgment is affirmed; and the cause is remanded to the district court for further proceedings not inconsistent with this opinion.

SIBLEY, Circuit Judge (dissenting).

The judgment about to be entered, in my opinion, misconstrues and misapplies the Fair Labor Standards Act, and visits on the appellants most unjustly a heavy pecuniary penalty; and if followed in other cases and by other courts will cause great confusion in the iron and coal mining industries at a time when the country can least afford confusion.

The Act does not define "work time" or even "work". It may apply to each and every industry. What would be work in one industry may not be in another. It seems to me that a man is at work, for the purposes of the Act, when he is doing what he is hired to do. It may involve mental or physical effort, or it may consist in simple presence. It all depends on the contract of hiring. The Act did not intend to upset and nullify the wage contracts of force in the various industries. It simply fixed minimum wages for work done under them, and maximum hours. Of course contracts yield to the Act on these points, but they still control as to the work to be done, and the way it is to be done, and as to the scale of pay if not less than the minimum fixed by the Act. These things are left to bargaining, and especially to collective bargaining under the principles of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

No question is older in such bargaining than the question whether "travel time" is to be included in "work time". The worker has always thought he ought not to lose all of the time necessary to go to and from his place of work; the employer has thought he ought not to pay for time that produces no work results. The dispute has been resolved in various ways in employment contracts for pay estimated by the hour. Plumbers demand and get pay from the time they leave their place of business to go to a job until they return. Railroad trainmen get pay from the time they report for duty, no matter what delay may occur in the starting of the train. Railway trackmen also are paid from the hour of their assembly at the section point, though they may ride their motor car for miles before doing any track work. On the other hand carpenters, masons, and most artisans and laborers are paid for work only after they take up their tools on the job. As to coal and iron ore miners, traditionally they have been paid according to production, but their modern contracts have always included an express agreement as to their work time, and that agreement has excluded from work time the travel time in reaching the coal seam or ore bed, which were agreed to be the place of work. This is true of the

collective bargains made by strong unions throughout the Appalachian region, as it is true of the bargains under which the miners in this case have worked.[1] Their work time is agreed to be that spent at the ore bed. The employers' arrangement to get them to that place reliably and safely is primarily for the benefit of the miner and is not work for the employer, according to these agreements. The discomforts and dangers of the trip, as well as the loss of time, are all considered in fixing the rate of pay for the work of extracting the ore, and the pay scales here involved are far above the minimum fixed by the Act. The miner's work is hard and dangerous, but his pay is supposed to compensate for all this. If it would be better to include travel time in work time, it ought to be done by a new bargain in which rates of pay are also reviewed. If the change is to be by a special statute (some western States have such statutes), it will operate justly in futuro, and not by unexpected penalty, as here.

There is nothing in the Act to outlaw agreements that travel time in getting to or from the agreed place of work is not work time. This is true though the employer may organize a means of transportation and make rules for its use. The agreements here that work time includes only time at the face of the ore bed are not illegal. Digging out the ore is what the miners agree to do, and for that they are paid. Getting their tools together and riding or walking to the agreed place of work is not, by force of any law, work done for the mine owner. No one, I suppose, would say that if a group of miners who had spent an hour riding to work decided of their own will not to dig any ore and spent another hour riding back, they had done any work for which they should be paid by force of the Act.

Though these miners are paid according to their production of ore, they may not under the Act be employed, that is, "suffered or permitted to work", longer than the maximum hours per week without increased pay. These mines provide against that by fixing the hours at which they admit the miners and require them to leave, and especially by limiting the hours during which power is furnished for their drills. Section 7 of the Act has not been violated in this case unless the travel time is counted as work time, contrary to the contracts of employment and contrary to the expectations of those concerned for the past four years. Identical provisions in the employment contracts of the coal miners were decided by the Administrator to be good under the Act, and his conclusion was published, and thought applicable to the contracts here involved, until recently another position was taken as to iron mines.

It is now proposed to assess against these appellants as back pay for overtime an estimated quarter of a million dollars, to be doubled by way of penalty, to compensate the miners for their time in going to and from their place of work, in the face of their agreements that this time was not in their work time. They are to get three times as much per hour for riding and walking to and from the work they were

---

[1] On Sept. 18, 1933, the President approved a code for the Bituminous Coal Industry under the National Industrial Recovery Act, 48 Stat. 195, which provided: "Seven hours of labor shall constitute a day's work and this means seven hours of work at the usual working places for all classes of labor exclusive of the lunch period, whether they be paid on the day, or the tonnage, or other piece work basis."

The Appalachian agreement, which was and is the basis of the Union contracts with the eastern coal mines contains the provision: "Seven hours of labor shall constitute a day's work. The seven hour day means seven hours work in the mines at the usual working places for all classes of labor, exclusive of the lunch period, whether they be paid by the day or be paid on the tonnage basis."

Under these contracts "the usual working place" for miners has been universally understood to mean the face of the coal seam, and "travel time" to reach the seam is not "work time". The contracts and the practice have been of this sort since the eight hour day was established in 1898.

The contract between appellant Tennessee Coal and Iron Company and the union of its miners signed in October, 1938, Sec. 4, defined a day's work as eight hours, and a week's work as forty hours. "The eight hour day means eight hours of work in or about the mines at the usual working places for all classes of labor, exclusive of the lunch period, whether they be paid by the day or paid on the tonnage basis." As in coal mining, the usual working place of the miner has always been the face of the ore bed. The other appellants had more or less formal contracts to the same effect. Travel time has never been paid or expected under any of them.

hired to do, as they get for doing the work itself. The injustice of it to me is shocking.

If the decision stands and is followed, chaotic conditions will ensue, and this is good ground to believe that Congress intended no such thing. If for travel time triple back pay is due by these mines, it is due by all the iron mines having similar wage agreements. Many will go broke, or have to cease operations, causing a loss of jobs to their men. The new mines are not deep, and travel time is negligible, but one of the mines here involved is old and extensive, and the travel time is about one and a half hours per day. This is nearly a quarter of the present work day of seven hours. If that time is to be unproductive, but as costly as the production time, this mine can hardly survive. The wage scales for each mine everywhere will have to be renegotiated to adjust business for the future to the new conditions, with the risk of discontents and strikes.

The decision will have to be applied also to the coal mines. Coal and iron ore occur in similar beds, and are mined in the same general way. In both, the old mines have the same difficulties. The collective agreements made by strong unions throughout the Appalachian country all contain the provision as to worktime we are now dealing with. When the Administrator first proposed to contend for what this court is about to do, it was the unions who objected most cogently, and successfully. The letter of the Legal Director of United Mine Workers of America[2] to the Administrator which appears in this record is a very strong argument against the invalidating of the agreements. That argument prevailed then. It ought to prevail now, for it applies as exactly to the iron ore workers as it did to the coal miners. The chaos predicted for the latter will come to both if the Act is so interpreted as to invalidate all these agreements.

---

[2] Letter of Earl E. Houck to Philip B. Fleming, Administrator, dated July 9, 1940. That letter states, among other things: "Travel time was never considered as a part of the agreement or obligation of the employer to pay for in this industry, nor as hours worked by the employees, and this has been the case since the eight-hour day was established in the industry—April 1, 1898. It is urged that any ruling requiring such a change in the custom, tradition, and contract provision so as to change the work day from 'seven hours' work in the mines at the usual working places to any new standard for the measurement of time worked, and to the adjustment of wage rates made necessary thereby, would create so much confusion in the bituminous industry as to result in complete chaos, and would probably result in a complete stoppage of work at practically all of the coal mines in the United States."