**DONNELY et al. v. MAVAR SHRIMP & OYSTER CO., Inc. et al.**

No. 13419.

United States Court of Appeals Fifth Circuit.

July 17, 1951.

Rives, Circuit Judge, dissented.

Bidwell Adam, Gulfport, Miss., for appellants.

William S. Tyson, Solicitor, Bessie Margolin, Asst. Sol., William A. Lowe, and Pauline B. Heller, Attys., U. S. Dept. of Labor, all of Washington, D. C., and Beverley R. Worrell, Regional Atty., Birmingham, Ala., amicus curiae.

W. L. Guice, Biloxi, Miss., R. W. Thompson, Jr., Gulfport, Miss., for appellees.

Before HOLMES, BORAH and RIVES, Circuit Judges.

HOLMES, Circuit Judge.

This action is brought under the Declaratory Judgments Act, as amended, which is contained in Chapter 151 of the Federal Judicial Code of 1948, as amended by the Act of May 24, 1949. See Title 28 of U.S.Code, Sections 2201 and 2202. Federal jurisdiction is based solely on diversity of citizenship, and the amount involved exceeds $3000 exclusive of interest and costs. This appeal is from a judgment declaring the rights and legal relations of the parties under Section 213(a) (5) of Title 29, United States Code.

The Declaratory Judgments Act is a procedural statute that provides an additional remedy for use in cases of which the federal courts already have jurisdiction; it should be given a liberal construction. The procedure is expressly recognized in Fed. Rules Civ.Proc. rule 57, 28 U.S.C.A., which says that the existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate; also that the court may order a speedy hearing of an action for declaratory judgment, and may advance it on the calendar. See Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 5 Cir., 137

F.2d 176, affirmed in 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949; 'Gully v. Interstate Natural Gas Co., 5 Cir., 82 F.2d 145; Mississippi Power & Light Co. v. City of Jackson, 5 Cir., 116 F.2d 924; Borchard, Declaratory Judgments, pp. 619–621.

We have no doubt that this case involves an actual justiciable controversy, which in the interest of justice should be speedily heard and determined in accordance with the letter and spirit of the just-cited rule. Delay in adjudicating this controversy might be financially disastrous to many small operators in the shrimp and oyster industry. Said Section 213(a) (5), as amended, exempts from the minimum-wages and maximum-hours provisions of the Act any employee engaged in the catching or cultivating of any kind of fish, shellfish, or other aquatic forms of animal and vegetable life, including packing of such products for shipment, "processing (other than canning)," marketing, freezing, curing, storing, or distributing, the above products, or byproducts thereof. The word processing, as used in the exempting clause, includes a series of acts, events, and occurrences, which are necessary to transform raw seafood into an edible commercial product. The statute excludes from the minimum-wages and maximum-hours provisions of the Act every one of the acts and progressive steps, except canning, included in the term processing.

Canning includes hermetically sealing, and sterilizing or pasteurizing, and every other operation necessarily performed on the products before they are placed in cans, bottles, or other containers to be hermetically sealed, as well as the actual placing of the commodities in such containers; also included are subsequent operations such as the labeling of the cans or other containers, and the placing of the sealed containers in cases or boxes, whether such subsequent operations are performed as a part of an uninterrupted or interrupted process. Every other act or step in catching, curing, marketing, and distributing aquatic products is embraced in the exemption clause except only those especially performed upon the products for the purpose of canning. All the preparatory things are excluded from the act that can be and are done when canning is not intended or contemplated; and all the subsequent operations are excluded, as a matter of course, when canning has not actually taken place. Catching, freezing, curing, shelling, or shucking, shrimp or oysters, constitutes no part of the canning process. Corn is sometimes shucked in the field, and pecans are often shelled without canning. Wringing its neck and plucking its feathers are primary but separable processes in cooking a chicken, and all three are processes other than canning. The primary processes in the silk industry are performed in Asia, and the partially processed silk product is by law imported, duty free, into the United States. Ginning is the primary process in the cotton textile industry, but a cotton gin is distinguishable from a textile mill. A corn shucker is not a miller, and a shrimp picker is not engaged in canning shrimp, any more than a corn shucker is engaged in canning corn. The least that can be said is that the processes are separable; and that the Act so contemplated is indicated by retaining the exemption as to processes other than canning.

If picking shrimp and shucking oysters are not exempted, what are the processes other than canning that were in the legislative mind? Catching, cultivating, curing, storing, freezing, and marketing, are without qualification specifically exempted from the wages and hours law. What, then, we repeat, are the processes (other than canning) that the amendment intended to exclude from the exemptions if the actual canning retroactively embraced everything previously done to the product except catching, curing, freezing, storing, and marketing? The position and punctuation of clause (5) in paragraph (a) of Sec. 213, Title 29, indicate that the parenthetical words (other than canning) modify only the preceding word "processing," and not the words "marketing, freezing, curing, storing, or distributing". Curing means to prepare for preservation or permanent keeping; to preserve, as to cure beef or fish. See Webster's Dictionary. We must give full effect to all the words used by the Congress;

to do this means that preparing shrimp or oysters for preservation or permanent keeping is exempted from the provisions of both Sections 206 and 207 of said Title 29. These appellants are not engaged in canning; they do not work in the canning room; their work is frequently done without any intention on the part of their employer to can the articles that are being processed; they are engaged in ,a process involving shrimp and oysters that is distinct from, not necessarily related to, and often not succeeded by, canning. Cochrane v. Deener, 94 U.S. 780, 788, 24 L.Ed. 139; Waldman v. Swanfeldt, 9 Cir., 66 F.2d 294, 295; Henry v. Markesan State Bank, 8 Cir., 68 F.2d 554, 557; Waller v. Humphreys, et ux., 5 Cir., 133 F.2d 193; McComb **v.** Consolidated Fisheries Company, 3 Cir., 174 F.2d 74; Cincinnati Soap Company v. United States, D.C., 22 F.Supp. 141, 143; State v. Pacific American Fisheries, 73 Wash. 37, 131 P. 452–454.

The statute recognizes that, in obtaining and offering shrimp and oysters for sale for use as food, it is necessary to cultivate them, catch, cure, freeze, pack, can, or otherwise transform, them into a marketable product. Prior to 1949, Section 213(a) (5) exempted every act of an employee in catching, curing, canning, cultivating, and marketing, any kind of shellfish or other aquatic forms of animal and vegetable life. In 1949, Section 213(a) ¡(5) was amended so as to exclude canning from the exemption, but it left the exemption intact as to every other distinct act and feature of the industry that was necessary to convert the raw material of aquatic life into a marketable product. As used in the statute, processing is an inclusive word that embraces all the acts necessary to improve the material and convert it into an edible product. The amendment of 1949 did not strike the word processing out of the exempting clause (as it might have done), but limited its scope and effectiveness only to acts and doings other than canning. The act of canning is only one of several processes necessary in turning the aquatic material into food fit for human consumption. We must ascribe to the legislative mind some reason for leaving the word processing (other than

canning) in the exemption clause of said Section 213(a) (5). What are processes other than canning are questions of fact to be decided upon the special characteristics of the process or operation of the particular business or industry.

The findings of fact by the district court are not clearly erroneous; and the judgment appealed from is affirmed.

Affirmed.

RIVES, Circuit Judge (dissenting).

In arriving at what is included in "canning", I do not think that the word "processing" in the exempting clause of the 1949 amendment is significant, because at the same time Section 213(b) (4) was added providing an exemption from the overtime requirements only for "the canning of any kind of fish, shellfish, * * *," and there the word "processing" was not employed. It seems apparent that the overtime exemption was intended as a substitute for the complete exemption previously provided in Section 213(a) (5) for "any employee employed in * * * canning".

Canning is just one form of processing and to exclude everything included in the broader term would leave to canning a very limited meaning. I think that canning includes the necessary preparation of the product performed as an integral part of a continuous uninterrupted process even though the same preparation might be necessary to make the product edible without canning. That the product must be shucked, cleaned, peeled, and cooked before it is eaten at all does not remove those operations from canning when they are performed in connection with canning and as a part of that process. Exemptions from this Act must be "narrowly construed" and extended only to "those plainly and unmistakably within its terms and spirit". A. H. Phillips Co. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095.

Nevertheless, *upon the record before us,* I would concur in the result if I could bring myself to believe that the case presents an actual controversy. To my way of thinking, it is plainly a "friendly" suit "in which there is no actual antagonistic assertion of rights." C. I. O. v. McAdory,

325 U.S. 472, 475, 65 S.Ct. 1395, 1397, 89 L.Ed. 1741. A careful study of the record leads me inescapably to the belief that both sides desired the same result to this proceeding and gave the Court not the slightest chance of arriving at a contrary conclusion.

The plaintiffs are two companies engaged in the commercial canning of shrimp and of oysters as well as in their taking and harvesting, cleaning and processing. The defendants are eighteen "casual workers" of the plaintiffs selected by the plaintiffs themselves out of a total of about 400 laborers. We must know in reason that the defendant casual workers had no considerable funds with which to employ counsel. Upon oral argument when plaintiffs' counsel praised the generosity of defendants' counsel in representing his clients without charge, defendants' counsel shook his head, but it is hard to say whether that was in denial of the praise or in disapproval of the propriety of the observation in open Court.

The complaint alleged in paragraph 3 that "none of the defendants above named, at any time during the period hereinabove recited, was engaged in the canning of sea foods or aquatic products." The defendants admitted the allegations of paragraph 3 of the complaint. Thereby they literally admitted themselves out of Court. Further the defendants in their answer admitted that the functions which they performed (picking of shrimp and shucking of oysters) "are separate, distinct, and have no immediate relationship" to the canning, and further "that the canning * * * is separate, distinct, unrelated to and apart from the original process in which the shrimp or oysters are received at the wharf, going through a distinct and intricate process by which they become merchantable food prior to any of the actual processes needed or required in canning." The only allegations of the complaint which the defendants denied were the conclusions of the pleading with reference to the meaning of the law.

If we would assume that the admissions in the defendants' answer were made unintentionally or by oversight we have but to examine the evidence. A single witness testified for the plaintiffs, the superintendent of one of their plants. He first testified favorably to the defendants as follows:

"Q. Now, before the Court today, Mr. Mavar, is whether or not the shucking of oysters, that is, the operation beginning at the pier and ending at the pay-off window, if that is a necessary part of the canning of oysters. Do you know anything about that—I mean, are you acquainted with that? A. Yes, sir, that is a part of the canning."

The defendants made no point of this admission, but permitted plaintiffs' counsel by leading questions to get the witness to conform his testimony to the plaintiffs' case.

The plaintiffs had "other witnesses who would testify to substantially the same thing as this witness," and naturally the Court saw no necessity of examining the other witnesses. So the plaintiffs rested.

The defendants called two witnesses, both women, one the President and the other the Secretary and Treasurer of the Seafood Workers Association, a union that was supposed to represent the defendants.

The President expressed her complete accord with, and volunteered to make a moving speech for, the *plaintiffs* in the following answers:

"Q. If you paid them all the same 75¢ an hour, many of them would only pick about 10 pounds an hour? A. Right.

"Q. Then you would be paid 75¢ an hour for only 40¢ an hour? A. That's right. And, may I say this, that our workers don't want that. They want to earn what they can earn. We have a good many old workers in our plant, who have grown old in service. They can go in these plants, and they are permitted to go and come as they please. They can work three or four hours and go on home, and they thank God every night of their life that they were permitted to earn that day. They are satisfied and don't expect to make as much as the fast workers. Every body is satisfied with what they can earn."

The Secretary-Treasurer was scarcely less zealous than the President in her accord with the *plaintiffs*:

"Q. I want to ask if there is anything that you know about this lawsuit with reference to the wages of employees, piece working employees, you care to state in any manner, of the desires in this case; have you got any information you care to give the Judge? A. We would like to work like we did in the past, which has been the method of our grandmothers and grandfathers. In piece work you earn what you can, a scale of work set by the association and then brought to a meeting with the packers. We would like to work like we did in the past."

The sensible precaution was observed by defendants' counsel of examining several of the defendants themselves, but simply as to their conclusions of whether the President and the Secretary-Treasurer of their organization had testified truthfully, accurately and correctly. In each instance the defendant witness answered yes, and that if asked all the questions the answers would be the same. That was all of the testimony for the defendants.

Small wonder that the Court found it necessary to inquire from defendants' counsel:

"By the Court:

"Let me ask you, Mr. Adam. As I understand it these defendants are really demanding the minimum wage if they are covered by it?

"By Mr. Adam, Counsel for Defendants:

"Yes. We claim they come in under the wage and hour law."

On appeal, this Court's responsibility is the more grave in that if the majority is in error, that error will probably not be corrected because the *amicus curiae* can go no further and the parties seem to be of a single mind.

If this judgment merely concluded the eighteen named defendants it would be bad enough, but when we consider that it concludes also "all persons working for the plaintiffs who are similarly situated with the defendants," and that the plaintiffs employ about 400 laborers and further that it sets a pattern for the future and affects persons to be employed in the days to come,

and when we still further consider the use of this case as a precedent either by the Administrator or by the Courts, then, if the Court decides this case without the safeguard of adequate presentation of all questions of law and fact by actual antagonistic parties, it is clear that the Court itself might become the instrument of working an injustice. The effect of the decision in this case that shuckers of oysters and cleaners of shrimp are exempt wholly instead of partially from the Wage and Hour Law is relatively unimportant compared to the danger of the precedent set when we take jurisdiction of a case that involves no actual controversy.

In declaratory judgment actions such as this there are involved the interests not only of the employers who are parties and their employees, but also of competing employers and their employees, and still further those of the public. Tennessee Coal Iron & R. Co. v. Muscoda Local, D.C., 40 F.Supp. 4, affirmed 5 Cir., 135 F.2d 320, rehearing denied, 5 Cir., 137 F.2d 176, affirmed 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949, is taken as a precedent for this action. That case was hotly contested; counterclaims on behalf of the employees were filed and were successfully prosecuted. There was no counterclaim in the case now before the Court. In the Muscoda case the administrator intervened in the District Court and hence the interests of the public and of competitors were represented. Appearance of the Administrator as *amicus curiae* in the appellate court, though helpful, is not sufficient, for the record on which the case must be decided is concluded in the District Court.

If the decision in the instant case stood without dissent, I anticipate that a number of similar suits would be filed, and that in most of them the friendly nature of the suit would not be so self evident as in this case. It seems to me that in the exercise of the discretion vested in a district court, it should refuse to proceed with such a declaratory judgment action in the absence of the Administrator to represent the interests of competing employers and employees and of the public.

I think that the judgment should be reversed with directions to the district court to dismiss the cause unless the Administrator becomes a party, and therefore I respectfully dissent.