**TOBIN, Secretary of Labor, v. BLUE CHANNEL CORP. et al.**

**Civ. A. No. 2913.**

United States District Court

E. D. South Carolina, Charleston Division.

Feb. 12, 1952.

William S. Tyson, Solicitor, U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., F. Marshall Neilson, Atty., Birmingham, Ala., for plaintiff.

W. Brantley Harvey, Beaufort, S. C., for defendants.

WARING, District Judge.

The Plaintiff, as Secretary of Labor, has brought this action against Defendant, Blue Channel Corporation, a corporation and two individuals asking for an injunction against them under the Fair Labor Standards Act, Title 29, U.S.C.A. § 201, et seq. The Defendant corporation has its principal office at Beaufort and its canning plant at Port Royal, both in the County of Beaufort, South Carolina and within the jurisdiction of this court. The two individual defendants are respectively the President and Treasurer of the corporation and reside within the jurisdiction and are actively engaged in the management of the corporation.

It is alleged that the Defendants are engaged in the production of goods for interstate commerce and that they are subject to the provisions of the Act. It is further alleged that there have been violations of the Act and an injunction is asked. The Defendants have appeared and admit that they are engaged in interstate commerce within the meaning of the Act but allege that while certain of their activities are covered by the Act, others are not. They claim that they have fully complied with the Act as relating to all employees engaged in the production of goods for interstate commerce but claim that certain of the employees come within the exemptions of the Act and particularly the exemption of Section 213(a) (5).

The Defendants are engaged in the business of processing, shipping and handling sea food; among other things, tuna fish, oysters, shrimp and crab meat. The only matter in issue is in relation to the production of the last named. And even that may be broken down into a narrow section, namely, the crab meat obtained from the crab claws.

It appears that the method of handling this product is substantially as follows: crabs are brought to the plant either by boat or truck. In either event, they are brought to what is known as the loading platforms and there they are washed and cleansed and then loaded into small containers on wheels that are rolled into steam cookers. They are carried from the steam cooking room into another room known as the crab picking room and there they are placed upon tables. There are two long "picking tables" around which are seated "claw pickers" or as they are sometimes known "claw crackers". The method of handling seems to be as follows: as the steamed crabs are brought in, one operative breaks off the claws from the crab bodies. Certain workers handle the body of the crab removing what is known as the white meat and discard the shells; entrails and other waste products. The claws with which we are concerned here are placed in containers and passed on to the claw pickers.

It appears that a picker then cracks the claws and extracts therefrom the meat. In this process the meat is often broken or shredded into small parts by the workers and they are instructed to endeavor to get the meat out in as large sections as is feasible. Of course, this result varies with the skill and efficiency of the individual. Each picker has two pans and is directed to, as far as possible, put the larger whole pieces of meat in one pan and the broken shredded pieces in the other. There is no definite demarcation as to size but the picker is supposed to use some discretion in endeavoring to make the larger portions available in a separate pan. The larger pieces are better looking and make a more attractive pack and are preferred as top filling or dressing in the product which is put in sealed cans. After a picker has filled his pans, they are carried to a weighing table, the weight taken and a record made of the same. This is for

purposes of record as to how much meat is available and is for use in arriving at the pickers' pay. The picker's job ends there and another employee takes over the pans or containers of crab claw meat and the next act is to immerse the same in a tank which contains a strong solution of brine.

There is some testimony that a small quantity of the crabmeat at times is not put in the brine solution but is immediately put on ice and later disposed of as fresh meat. This, however, is a small exception, does not often happen, and occurs only when there is an excess of material on hand and those in charge are fearful that they will not be able to process the product before some of it spoils. This exception is noted in passing but does not have any effect upon the ultimate decision especially since the subject crab meat does not go into the canning process.

To go back to the regular course of processing; after the material has been immersed in the brine solution, it gradually passes through and the purpose of the brine solution is primarily to allow the meat to float along the current of moving water while such portions of shell or bone or non-edible portions sink in the solution and the usable material is thus separated from waste. When the meat reaches the end of the brine tank, it may take one of two courses. This is determined by the operative in charge and is dependent upon whether the plant has orders primarily for canning or for disposing of the material as either fresh crabmeat or to be sent to the freezing department to be shipped as frozen crabmeat. If it is either of the last two, that is fresh or frozen, the material is gathered in pans as it comes to the end of the tank and conveyed for processing by being put in containers or packed in ice or sent to the deep freezer. Such amount of crabmeat as is handled in that way is definitely not a part of the canning process and no claim is made that the wage and hour provisions would apply to that portion of the pack.

What we are concerned with, however, is such portion of the crabmeat as is destined and designated for actual "canning," that is to say, to be placed in cans which will be hermetically sealed and handled as is usual in the canning industry. Such portion of the crabmeat as comes out of the brine tank that is destined for this last named process is carried by belts through an additional process. It is immersed for almost one minute in a solution of aluminum sulphate. This is done to prepare it for the final canning process and it is in testimony that this treatment prevents a discoloration or tendency to turn bluish of crabmeat which is put in cans and sealed. After a short immersion in that solution, the crabmeat is carried to the actual canning tables where it is put in cans, goes through the ordinary and regular process of being hermetically sealed and then through an additional steaming or sterilizing and finally the cans are taken out, crated and marketed. There is no question whatever but that such portion of the pack as is handled in the last named manner, that is to say, what is sent through the aluminum sulphate solution and canned is part of the canning process and all workers from that time on are definitely under the wage and hour provisions. The payment of these workers is in accord with wage and hour provisions but the sole question is whether the pickers whose work has been heretofore described are a part of the canning process.

Defendants claim that the canning process starts where the crab meat is diverted to canning and does not apply to that that goes to fresh meat or frozen departments. The Government contends that the picking is an integrated part of the canning process and that the wage and hour provisions apply not only to those engaged in the actual canning business but to those who prepared the meat in its initial stages, namely, the pickers.

There is in evidence a tabulation or summary showing the amount of crab claw meat picked and handled in the plant during the year 1951. This tabulation shows no production during the month of January and part of February, 1951, but starting about the middle of February it carries on by weekly tabulations, through the end of December. The tabulation shows

the pounds of claw meat purchased from other producers and the pounds picked and the disposition of the various materials. It appears from this that the pounds of claw meat purchased was 13,456. The claw meat picked in the plant was 26,806. Now all of this material was disposed of in the following manners: Pounds canned, 20,-657; pounds sold as fresh, 2,067; pounds used in the frozen foods, 17,698 pounds (these were in two categories, deviled crab, 11,670, crab cakes, 6,028). It will thus be seen that approximately one-half, or slightly more, of the claw meat handled went in the canning process and a little less or about 49% went as fresh or frozen food.

The foregoing summary of the factual situation is amply sustained by the evidence and is a finding of facts by this Court.

■ The conclusions I reach is that the pickers are engaged in work not covered by the wage and hour provisions of the law and that they come within the exemptions set out in Section 213(a) (5).

■ The matter of exemptions under the statute seems to have been carefully considered by the Congress. The exemption applicable to this case is a recent amendment. The Government takes the position that these pickers should be protected by the wage and hour provisions and points out that there is no reason to differentiate since a large part of the product of their work goes into interstate commerce. As a matter of right, justice and policy, I agree. And if Congress had not created this specific exemption I would have unhesitatingly held that these workers were covered by the provisions in every respect. However, it will be noted that Congress revamped and revised the Fair Labor Standards Act in many particulars. Numerous decisions of courts of first instance and appellate courts, including the United States Supreme Court had extended the coverage of the Act to many industries. The Congress evidently determined to restrict the Act in many particulars and the effect of the Amendments undoubtedly has been to overrule and vacate a large number of court decisions. And so we are met with a distinct enactment of the Congress of the United States whose province it is to determine and decide the policy to be pursued in the coverage or exemptions under the Act. Exactly the same question has arisen in the 5th Circuit. In the case of Donnelly v. Mavar Shrimp & Oyster Co., 190 F.2d 409, the Court of Appeals for the 5th Circuit passes upon a question similar to that now before me. In that case, the Court, 190 F.2d at page 412 says: "The statute recognizes that, in obtaining and offering shrimp and oysters for sale for use as food, it is necessary to cultivate them, catch, cure, freeze, pack, can, or otherwise transform, them into a marketable product. Prior to 1949, Section 213(a) (5) exempted every act of an employee in catching, curing, canning, cultivating, and marketing, any kind of shell-fish or other aquatic forms of animal and vegetable life. In 1949, Section 213(a) (5) was amended so as to exclude canning from the exemption, but it left the exemption intact as to every other distinct act and feature of the industry that was necessary to convert the raw material of aquatic life into a marketable product. As used in the statute, processing is an inclusive word that embraces all the acts necessary to improve the material and convert it into an edible product. The amendment of 1949 did not strike the word processing out of the exempting clause (as it might have done), but limited its scope and effectiveness only to acts and doings other than canning. The act of canning is only one of several processes necessary in turning the aquatic material into food fit for human consumption. We must ascribe to the legislative mind some reason for leaving the word processing (other than canning) in the exemption clause of said Section 213(a) (5). What are processes other than canning are questions of fact to be decided upon the special characteristics of the process or operation of the particular business or industry."

In arguing the case before me, the Government severely criticised the decision in the Donnelly case and pointed out that one member of the Court dissented. It is claimed that the case was not a real test and that it was instituted and handled on a friendly basis. The dissenting judge ob-

jects to the method of handling the case and does take the position that the Court should not enter a declaratory judgment because to his mind there was no actual antagonistic assertion of rights in the case and that the District Court should not have issued a declaratory judgment upon the apparent acquiescent and friendly attitude of the parties. The dissent, however, is undoubtedly a protest against the method of bringing the case and not the result arrived at since in the dissent, it is said "nevertheless, *upon the record before us,* I would concur in the result * * *."

In the instant case, there is no question as to it being an actual controversy. The Government brings this case and it is fought vigorously. The issues are clear and distinct but they add up in my opinion to the same result arrived at in the Donnely case: First, because that decision is by an appellate court of high repute and ability; and secondly, because I believe that the Court has there correctly analyzed and decided the meaning and intent of the exceptions in the statute. And so I shall and do hold that the crab pickers involved in this suit come within the exemptions of the Fair Labor Standards Act, § 13(a) (5), 29 U.S.C.A. § 213(a) (5) and hold that the case must be dismissed.

The matter of whether the pickers actually received the minimum wage prescribed by the Act was also an issue raised by the Defendants' answer. The Government says that some of these pickers did not receive the full wage and the Defendants contended that they had paid wages equal to the minimum wage although they denied they were required so to do. This issue of fact was raised by the pleadings and the Government made an offer of proof by a number of witnesses to show that the Defendants had failed to live up to the standards required. In view of my holding as to these workers coming within the exemptions of the Act, I hold it unnecessary to pass upon the fact of how many of the workers were paid over or under the minimum standard and make no decision upon that issue of fact.

For the foregoing reasons, the Complaint herein is dismissed.