**TOBIN v. BLUE CHANNEL CORP. et al.**

No. 6434.

United States Court of Appeals
Fourth Circuit.

Argued June 24, 1952.

Decided July 31, 1952.

246

Bessie Margolin, Asst. Solicitor, Washington, D. C., United States Department of Labor (William S. Tyson, Solicitor, William A. Lowe and Sylvia S. Ellison, Washington, D. C., Attys. and Beverley R. Worrell, Regional Atty., Birmingham, Ala., United States Department of Labor, on brief), for appellant.

W. Brantley Harvey, Beaufort, S. C., for appellees.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and PAUL, District Judge.

DOBIE, Circuit Judge.

This civil action was instituted in the United States District Court for the Eastern District of South Carolina by the Secretary of Labor under Section 17 of the Fair Labor Standards Act of 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq., as amended in 1949 by c. 736, 63 Stat. 910, 29 U.S.C.A. § 201, to restrain Blue Channel Corporation, Sterling G. Harris and P. A. C. Ellis from violating the minimum wage and record-keeping provisions of the Act with respect to their employees engaged as "claw crackers" or "claw pickers," and from shipping or delivering for shipment of goods produced in violation of the standards in the Act. After trial, the District Court entered an opinion and order dismissing the Secretary's complaint on the ground that the employees involved come within the complete exemption from both the minimum wage and overtime requirements provided in Section 13 (a) (5) of the Act for "processing (other than canning)," rather than within the exemption from the overtime compensation requirement only provided in Section 13 (b) (4) for "canning." This appeal is from the court's order dismissing the Secretary's complaint. The opinion below is reported in 102 F.Supp. 614.

There is little or no dispute as to the facts. Blue Channel Corporation and the individual appellees, both officers of the corporation and both actively engaged in its management, operate a canning plant at Port Royal, South Carolina, where they are engaged in canning, freezing and handling seafood, including tuna fish, oysters, shrimp and crabmeat. We are here concerned with the operations performed on crabmeat obtained from the claws of the crab, and with the employees known as "claw crackers" or "claw pickers."

Appellees' canning plant consists of a dock, loading platforms, a steam cooking room, a picking room, two canning or packing rooms, and a warehouse. It is designed essentially for the canning of crabmeat on an assembly line basis whereby the crabs, upon reaching the loading platforms, are moved by an efficient mechanized system through a continuous series of operations which result in the canned product.

The claw pickers perform the necessary preparatory operations of extracting the meat from the claws of the crab and separating the larger or whole pieces from the smaller or broken ones. Their operations are all integrated and immediately followed by placing the meat in the cans and hermetically sealing them, unless the meat

is drawn off manually to be processed some other way.

The canning process is a continuous, speedy, and closely integrated series of operations. Ordinarily, the total time consumed from the time the claw pickers start picking until the cans are hermetically sealed and sterilized is only two and one-half hours. The operations begin at the loading platforms where the live crabs are weighed and washed and then, because they are highly perishable and have to be cooked immediately, placed into steam cars, pushed along a track into the steam boxes in the steam cooking room and cooked. Then, by an electric hoist, the cooked crabs are dumped out of the steam cars into wagons, wheeled into the picking room where the meat is extracted, sorted, weighted, and placed in a dip tank of brine solution to remove the bones and ligaments. From this point on, the meat moves automatically, first by water flow and then by conveyor belts, through the brine tank, then under shower heads to wash off the brine solution, then to a second dip tank to be treated with a patented solution of aluminum sulphate, and then into the packing room where the meat is packed into cans, placed on another belt and carried to the hermetical-sealing machine. Upon being sealed the cans are sterilized, cooled, labeled, cased and ready for shipment.

Not all of the crabmeat is canned. Some is sold fresh and some is frozen in the form of deviled crab cakes. Since all of the necessary preparatory operations are integrated with the canning operations, meat that is not to be canned must be diverted manually from the regular mechanical succession of canning operations. This is done by catching the meat in pans as it falls off the conveyor belt which would normally deposit it automatically in the aluminum sulphate tank. The diversion is made at this point, because treatment in the aluminum sulphate tank would render the meat unsuitable for anything except canning.

Canned crabmeat is a relatively new product. Appellees spent six years developing their canning process and have been making special efforts to establish their brand name. Canning is the preferred channel and over half of their crabmeat is canned. However, substantial orders for fresh and frozen crabmeat are taken by appellees. These are received at the Beaufort office, usually by telephone or telegram since fresh or frozen meat is not ordered several days in advance. That office decides whether the crabmeat is to be canned or diverted from canning to fill other orders. In the making of this decision, preference is decided entirely on price. If no fresh or frozen meat orders are on hand, the meat is canned.

The District Judge, in reaching the conclusion that the claw pickers here were engaged in "processing (other than canning)" and thus came within the exemption of Section 13(a) (5), seems to have relied heavily on the decision of the Fifth Circuit in Donnely v. Mavar Shrimp & Oyster Co., 190 F.2d 409.

There are some factual differences between that case and the one before us. The parties there agreed that none of the employees involved was "engaged in the canning of seafoods or aquatic products," and that the functions which they performed (picking shrimp and shucking oysters) "'are separate, distinct, and have no immediate relationship'" to the canning, 190 F.2d at page 413. There was no such stipulation in our case. Circuit Judge Rives dissented, holding that the proceeding was merely a friendly suit and that "both sides desired the same result to this proceeding and gave the Court not the slightest chance of arriving at a contrary conclusion." 190 F.2d 412–413.

The majority opinion of Circuit Judge Holmes in the Donnely case, 190 F.2d at page 411, conceded that:

"Canning includes hermetically sealing, and sterilizing or pasteurizing, and *every other operation necessarily performed on the products before they are placed in cans*". (Italics ours.)

To like effect, see Report of House Conferees, 95 Cong.Rec. 14874, 14878 (1949). At 190 F.2d 411, the majority opinion asks this question: "If picking shrimp and shucking oysters are not exempted, what

are the processes other than canning that were in the legislative mind?" Certainly, scores of situations could be mentioned in which products are processed but not canned. It might be noted, too, that the government was not a party to the Donnely case, had no part in shaping the record and could not seek review of that decision by the Supreme Court.

If the Donnely case be not distinguishable from the instant case before us, we must decline to follow the majority opinion of Circuit Judge Holmes.

As has been earlier indicated, the work of the claw pickers, in extracting the crab meat from the claws, is an early and preparatory, but none the less an essential and integrated, step in the continuous and uninterrupted process of canning crabmeat. All the necessary steps occupy only a few hours. All these steps are performed in the same building by the employees of a common employer, here the appellee.

■ Under these circumstances, we hold that the work of these claw pickers falls within the purview of Section 13(b) (4) of the Act as "canning", and not within the terms of Section 13(a) (5) as "processing (other than canning)". They are thus subject to the record-keeping and minimum wage provisions of the Act under Section 13(b) (4). This conclusion, we think, accords with both the history and the purpose of the Act.

Nor does it help the appellees here that part of the crabmeat picked by these claw pickers is not canned at all but is sold in other forms, such as crab flakes or crab cakes. Clearly, Congress intended the minimum wage provisions to apply to canning operations. Appellees should not be permitted to evade these provisions by merely intermingling canning with other operations. Any other rule would provide too easy an avenue for avoiding the operation of the Act. When, here, the claws are picked, it is not known whether specific portions of the crabmeat thus picked are destined for canning or for sale in other forms.

■ The law is well settled that where a substantial, integrated and closely connected part of the work of an employee falls clearly within the terms of a federal statute, the statute is applicable, even though another part of this employee's work is not included within the statutory ambit. As was said by Judge Parker, speaking for our Court in Guess v. Montague, 140 F. 2d 500, 504:

"It is a fair inference from the evidence that plaintiffs here worked on interstate as well as intrastate business; that the two classes of business were commingled in defendant's operations; and that defendant did not attempt to distinguish between the two in the payment of wages. Under such circumstances, we think that plaintiffs have made a prima facie showing entitling them to the protection of the act."

See, also, Powell v. United States Cartridge Co., 339 U.S. 497, 513, 70 S.Ct. 755, 94 L.Ed. 1017; United States v. Darby, 312 U.S. 100, 118, 61 S.Ct. 451, 85 L.Ed. 609; Wabash Radio Corporation v. Walling, 6 Cir., 162 F.2d 391; Anderson v. Manhattan Lighterage Corporation, 2 Cir., 148 F.2d 971; Fleming v. Swift & Co., D.C., 41 F.Supp. 825, Walling v. Swift & Co., 7 Cir., 131 F.2d 249.

■ We are here dealing with a remedial statute. Its terms of coverage should, therefore, be liberally rather than narrowly construed. See, Missel v. Overnight Transportation Co., 4 Cir., 126 F.2d 98, 103, affirmed 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Atlantic Company v. Weaver, 4 Cir., 150 F.2d 843, 847.

■ To ignore this principle here would be to view the necessary preparatory operations of the claw pickers in picking and sorting the crabmeat in isolation from the canning process as a whole. Such an approach seems unwarranted in view of the clear showing that canning is the main objective of the appellees and that it is accomplished by a continuous series of operations, including those here involved. The principle which should guide our decision here was expressed by Judge Barksdale, speaking for our Court, in Bennett v. V. P. Loftis Co., 4 Cir., 167 F.2d 286, 288:

"If the declared purpose of the Act is to be accomplished, a project should be considered as a whole, in a realistic way; not broken down into its various phases so as to defeat the purpose of the Act. This latter unrealistic approach was condemned by the Supreme Court in Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460."

The judgment of the District Court is reversed and the case is remanded to that Court with instructions to grant the injunction sought by Secretary Tobin if the conditions requisite to such an injunction should be found to obtain.

Reversed and remanded.