## McCOMB v. CONSOLIDATED FISHERIES CO.
### No. 9696.

United States Court of Appeals Third Circuit.

Argued Dec. 21, 1948.

Decided March 31, 1949.

William A. Lowe and E. Gerald Lamboley, both of Washington, D. C. (William S. Tyson, Sol., Bessie Margolin, Asst. Sol., and Frederick U. Reel, all of Washington, D. C., and Ernest N. Votaw, Regional Atty., of Philadelphia, Pa., on the brief), for appellant.

James M. Tunnell, of Georgetown, Del. (Tunnell & Tunnell, of Georgetown, Del., on the brief), for appellee.

Howard P. Castle, of Washington, D. C. (Edward W. Allen and Allen, Hilen, Froude & De Garmo, all of Seattle, Wash., Eugene D. Bennett, Pillsbury, Madison & Sutro, Robert Littler and Littler, Coakley & Lauritzen, all of San Francisco, Cal., and H. Thomas Austern, of Washington, D.C., on the brief), amici curiae.

Before MARIS, GOODRICH and KALODNER, Circuit Judges.

MARIS, Circuit Judge.

This action was instituted by the Administrator of the Wage and Hour Division, United States Department of Labor, in the United States District Court for the District of Delaware, to enjoin violations of the minimum wage, overtime and record-keeping requirements of the Fair Labor Standards Act of 1938.[1] After trial the district court entered a judgment denying the injunction and dismissing the complaint on the ground that defendant's employees were within the exemption provided by Section 13(a) (5) of the act. 75 F.Supp. 798.

The defendant is a Delaware corporation having a plant at Lewes, Delaware, consisting of a wharf or dock, manufacturing plant, storage houses, storage tanks, railroad sidings, bunk houses, mess hall and kitchen. From late May or early June until October or November of each year, menhaden fish are brought to the dock by defendant's boats or those of other fishermen from whom it buys fish. About half of the fish are secured from each source. At the dock or wharf the fish are unloaded from the boats and conveyed by a sluice or water conveyor to the factory. Here the water is drained off and the fish are cooked and pressed. The oil and water extracted by this process are run through a series of tanks causing pieces of fish in the liquid to fall to the bottom of the tanks. The oil is then drained into other tanks for cooking and storage. Two grades of oil are secured, Grade A and gurry oil, the grade depending upon the condition of the fish at the time of processing. The sediment resulting from the manufacture of the oil, particularly from the gurry oil, is made into gurry cake, which is sold for fertilizer.

The solid portions of the fish, which remain after the extraction of the liquids, are run through dryers and converted into dried scrap or fish meal. The latter two products are principally used for poultry and cattle food but to some extent for fertilizer. When the scrap contains too much oil for manufacture into dried scrap or fish meal, it is treated with sulphuric acid to produce a product called acidulated fish scrap, which can be used only for fertilizer.

If the fish are processed within ten or twelve hours after being caught, most of the extracted oil will be Grade A and the fish scrap of good quality. After that period of time, the fish deteriorate rapidly, with the result that not all of the oil can be extracted. The resulting scrap tends to harden and gum up, so that it can be used only as fertilizer. After the oil has been extracted, it remains a fairly stable product. The fish scrap and meal, however, must be carefully cooled and stored to prevent the possibility of spontaneous combustion; consequently, these latter products are not stored on the premises any longer than necessary to find a market. There have been times when scrap and oil have been stored until the following fishing season, but during recent years it has been possible to find a market for all of the oil and scrap by the end of the year or shortly after the beginning of the following calendar year. The plant has a storage capacity of about 15,000 tons of fish scrap or meal and 75 carloads of oil, the results of approximately two months' processing.

The plant is situated two miles from the nearest town and restaurant, and, since a large number of the manufacturing employees come from distant places, the company provides them with bunk houses and a mess hall. It would not be possible for them to go elsewhere for their meals, both because of the distance and because of the odor caused by their working with fish. The company employs a cook and other help to furnish the employees with meals.

After the close of the fishing season in October or November, most of the manufacturing employees return to their homes.

---

[1] 29 U.S.C.A. § 201 et seq.

A skeleton crew remains, however, and works throughout the non-fishing season. During this period, the premises are cleaned of fish which have accumulated during the fishing season. These fish particles, which take the form of a gummy and hardened mass, must be removed from conveyors, flights, drives, chains, filters, drain slots and sediment tanks. Machinery, including the huge presses, must be taken apart to remove this material. The gummy and hardened nature of this substance requires the use of chisels and hammers, and in clearing piles from the ground, dynamite is sometimes necessary. Some of this recovered material, having no commercial value, is used as fill on the premises. However, approximately two hundred tons are retrieved each year by this cleaning process which can be converted into acidulated fish scrap and sold. Because of the small number of laborers, the job of clearing the previous season's accumulation and preparing for the new season takes almost all of the time between fishing seasons. In addition to the above described cleaning operations, the non-fishing season is utilized to replace pilings on the wharf, repair and overhaul boats, repair and paint machinery, and repair factory buildings and dormitories. This work is done during the non-fishing season because it is impossible to do such work during the fishing season without interrupting and interfering with the processing of fish.

Substantially all of the products produced at defendant's plant are shipped in interstate commerce, and all of defendant's employees are engaged in the production of these goods or in some process or occupation necessary to such production.

The employees involved in this action include a night watchman, a cook, an office employee, and several carpenters and maintenance men. The night watchman makes regular tours around the premises, during which he punches time clocks and watches the buildings and wharf for theft and fire. He is especially charged with the task of watching the fish scrap and meal, because of their susceptibility to spontaneous combustion and of spreading these pro-

ducts in order to cool them when necessary. He also watches tank cars for the presence of leaks or fires. The cook works in the mess hall preparing meals for the employees. The office employee keeps pay rolls, posts sales books and ledgers, keeps accounts of the sale and shipment of commodities, checks weight slips and helps with the billing, but does not route shipments. The carpenters and maintenance men are employed between fishing seasons to clean the premises of accumulated fish particles and retrieve the same, as above described, and to replace pilings at the wharf, install, paint and repair machinery, repair factory buildings and dormitories, engage in cement and carpenter work, and repair and overhaul boats.[2]

The district court found that these employees are engaged in interstate commerce or in the production of goods for interstate commerce throughout the entire year, and that defendant was not observing the minimum wage, overtime, and record-keeping requirements of the act. The court found, however, that these employees are within the exemption provided by Section 13(a) (5) for employees "employed in * * * processing, marketing, * * * storing, or distributing * * * [fish] products" in that the watchman "is employed either in the processing, marketing, storing, or distributing of menhaden fish or the by-products thereof," the cook "is engaged in the processing of menhaden fish products and byproducts," the office employee is "engaged in the marketing of menhaden fish products or byproducts," and the activities of the maintenance employees "are an integral part in the processing and marketing of the fish or byproducts thereof." If these findings are correct it is obvious that these employees are within the exemption of Section 13(a) (5) and that the judgment of the district court must be affirmed. The basic question with which we are presented on this appeal, therefore, is whether the district court erred in making these findings. Since the mediate data which we have recited are not in dispute the issue on this appeal is narrowed to the question whether those data justify the findings of the dis-

---

[2] No issue is raised by the Administrator as to the exemption of the carpenters and maintenance men during the fishing season.

trict court that the employees in question are employed in processing, marketing, storing, or distributing fish products within the meaning of the exemption set out in Section 13(a) (5) of the act. We accordingly turn to the consideration of the meaning of that subsection.

Section 13(a) (5) provides that the minimum wage and overtime provisions of the act shall not apply to "any employee employed in the catching, taking, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, including the going to and returning from work and including employment in the loading, unloading or packing of such products for shipment or in propagating, processing, marketing, freezing, canning, curing, storing, or distributing the above products or byproducts thereof".[3] The question for decision is whether it is the intent of the subsection to exempt only those employees who are themselves personally engaged in the physical acts of processing, marketing, storing, or distributing the fish products produced by the defendant or whether its intention is to exempt all the employees hired by the defendant in its business of processing, marketing, storing or distributing fish products whose services are necessary to the conduct of such business. To resolve this question we must turn first to the language of the subsection for if its meaning is clear there is no need to go elsewhere for its interpretation.

The significant language is that the stated provisions of the act shall not apply to any "employee employed in" the processing, marketing, storing, or distributing, inter alia, of fish products. In the light of the definitions of "employee" and "employ" included in the act[4] it is plain that the reference must be to an employee who is "employed" in the sense of being hired by an employer rather than in the sense of being engaged in a particular physical activity. Accordingly the subsection must be read as exempting all employees hired by an employer in "catching, taking, harvesting, cultivating, or farming of any kind of fish," including such hiring in "loading, unloading, or packing of such products for shipment or in propagating, processing, marketing, freezing, canning, curing, storing, or distributing the above products." The list of activities thus set out in the subsection is, and we think was intended by Congress to be,[5] a complete catalog of the activities involved in the fishery industry. Accordingly when Section 13(a) (5) exempts employees hired by an employer in these activities it plainly intends to exempt all such employees employed in the fishery industry, as thus described, even though the employees in question do not personally participate directly and physically in any one of the operations particularly mentioned, if in fact their services are nonetheless necessary to the conduct of those operations.

While the Administrator strongly opposes this construction of the language of the subsection he has been far from clear or consistent as to the interpretation of the statutory language which he regards as appropriate. Thus he has not consistently taken the view that the exemption is to be regarded as limited to those employees only who themselves physically engage in one of the particular operations mentioned in the subsection. On the contrary, on March 29, 1945 he stated in his Release A-15: "* * * the terms used in this subsection appear to have been intended to denote broad fields of activity relating to the seafood and fishery industry and should not be confined in meaning to specific physical operations so that only employees actually engaged in performing such operations would come within the exemption. In general, the applicability of the exemption is to be tested by the functional relationship of an employee's occupation to the activities mentioned in section 13(a) (5) rather than the engagement by the employee in the specific physical operations which the terms used in that section may describe."

With this general statement of the Administrator we are in full accord, but we cannot follow his application of it. For

[3] 29 U.S.C.A. § 213(a) (5).
[4] 29 U.S.C.A. § 203:
"(e) 'Employee' includes any individual employed by an employer.
"(g) 'Employ' includes to suffer or permit work."
[5] 83 Cong.Rec. 7408, 7443.

he seeks to draw a distinction between "offshore" or "trip" activities on the one hand, and "shore" activities on the other, and he construes the exemption very broadly with respect to the former and much more narrowly with respect to the latter. Thus as to "offshore" operations he concedes that employees engaged in any practices "performed as an incident to fishing"[6] are exempt, while as to "shore" activities the exemption, he says, applies only to employees whose occupations are so related to the activities mentioned in Section 13(a) (5) "that they are functionally identifiable as an integral part of the production or appropriation of the designated products or of the general movement to consumers or to a nonperishable state of such products."[6] The ten employees involved in this case he asserts were not so "functionally identifiable." We find no basis for such a distinction either in the statutory language or in the practices of the fishery industry as disclosed by the evidence. Nor do we fully understand the distinction which the administrator thus seeks to make between the various types of employees engaged in "shore" activities. Thus the fireman who serves fuel to the boilers which provide steam which cooks the fish is exempt, according to his theory of "functional identity," while the cook who serves food to the men who handle the fish to be cooked is not.

The Administrator asserts that with respect to "offshore" activities the exemption must be applied broadly because it was intended by Congress not to be narrower than the exemption provided for employees employed in agriculture by Section 13(a) (6).[7] There is undoubtedly basis in the legislative history of the act for concluding that there was a Congressional intention that the fisheries exemption should be equivalent to that granted to agriculture.[8] We think, however, that there is no warrant in that history for the distinction which the Administrator seeks to make between "offshore" and "shore" operations, and that he was on much firmer ground when in his Interpretative Bulletin No. 12,

issued December 7, 1938, he stated without qualification that the exemption of Section 13(a) (5) "was intended to do for the seafood and fishery industry that which was done in other sections of the Act for agriculture."

We are not confronted in this case with any question as to the extent to which the exemption of Section 13(a) (5) may apply to employees engaged in operations with respect to fish or fish products or by-products taking place after the first processing or at places other than the shore-side processing plant. For here we are dealing only with the shoreside operations of first processing. Accordingly Fleming v. Hawkeye Pearl Button Co., 8 Cir., 1940, 113 F.2d 52, Johnson v. Johnson & Co., D.C.Ga., 1942, 47 F.Supp. 650, and Dize v. Maddrix, 4 Cir., 1944, 144 F. 2d 584, affirmed 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296, have no bearing on our present problem. Nor need we decide whether the Administrator's distinction between fish products in a perishable and in a non-perishable state may properly be used in determining the application of the exemption to such subsequent operations. We merely hold that since this distinction is not made by Section 13(a) (5), it has no place in the application of the exemption to the employees of this defendant, which is engaged only in the taking of fish and the first processing of them at the shoreside. With respect, at least, to the defendant's operations all of its employees who are necessary to the carrying on of its fishery and fish processing activities are exempt by the plain language of Section 13(a) (5) of the act. In so holding we are not, as the Administrator argues, violating the accepted canon of construction that an exemption from a remedial act must be narrowly construed. On the contrary we are merely applying the exemption to those who are plainly and unmistakably within its letter and spirit. We are fortified in our conclusion by Waller v. Humphreys, 5 Cir., 1943, 133 F.2d 193, the only previous decision having any bearing on our present problem, although we do not agree with the conclusion of the

---

6 Release A-15, issued March 29, 1945 by the Administrator, Wage and Hour Division, U. S. Department of Labor.

7 29 U.S.C.A. § 213(a) (6):

"(6) any employee employed in agriculture".

8 83 Cong.Rec. 7443.

court in that case that the employees in the non-fishing season are not engaged in the production of goods for commerce. See Fleming v. A. B. Kirschbaum Co., 3 Cir., 1941, 124 F.2d 567, 571, affirmed 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. McCrady Const. Co., 3 Cir., 1946, 156 F. 2d 932, certiorari denied 329 U.S. 785, 67 S. Ct. 298, 91 L.Ed. 673.

We conclude that the district court was right in finding that the employees of the defendant here in question were employed in the processing, marketing, storing or distributing of fish or fish products within the meaning of Section 13(a) (5) and concluding that they were accordingly exempt under that subsection.

The judgment of the district court will be affirmed.