W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,

v.

Von CARSTEDT, individually and doing business as C-Air Aviation, Appellee.

No. 19474.

United States Court of Appeals Ninth Circuit.

May 6, 1966.

Charles Donahue, Solicitor of Labor, Bessie Margolin, Asso., Robert E. Nagle, Carin A. Clauss, Attys., Dept. of Labor, Washington, D. C., Altero D'Agostini, Atty., Dept. of Labor, San Francisco, Cal., for appellant.

Fred F. Wehrle, Eilers, Wehrle & Anderson, Los Angeles, Cal.; for appellee.

Before BARNES and HAMLEY, Circuit Judges, and JAMESON, District Judge.

HAMLEY, Circuit Judge:

The Secretary of Labor brought this action against Von Carstedt, individually and doing business as C-Air Aviation, to enjoin future violation of the Fair Labor Standards Act (Act).[1] After a trial the district court made findings of fact and conclusions of law upholding defendant's claim to exemption from the requirements of the Act. A judgment consistent therewith was entered and the Secretary appeals.

This case involves the application of the Act to twenty workers who were employed by defendant during various parts of the period from February 18, 1961 to February 18, 1963. These employees, who worked at defendant's airport facilities in Long Beach, California, were concededly within the general coverage of the Act. Defendant claimed, however, that during the period from February 18, 1961 to May 15, 1962 they came within the fisheries exemption of the Act, section 13(b) (4), 29 U.S.C. § 213(b) (4), and that from May 15, 1962 to February 18, 1963, they came within the retail establishment exemption of the Act, section 13(a) (2), 29 U.S.C. § 213(a) (2). The trial court upheld this claim. Plaintiff contends that, under the facts, neither exemption applies.

We consider first the trial court's findings and conclusions to the effect that the twenty employees were covered by the fishery operations exemption from February 18, 1961 to May 15, 1962. This exemption, contained in section 13(b) (4) of the Act, provides that section 7, relating to overtime, shall not apply to:

" * * * any employee employed in the canning, processing, marketing, freezing, curing, storing, packing for shipment, or distributing of any kind of fish, shellfish, or other aquatic forms of animal or vegetable life, or any byproduct thereof; * * *."[2]

---

1. 52 Stat. 1060 (1938), as amended, 29 U.S.C. §§ 201–219 (1964). The violations sought to be enjoined relate to the overtime, record-keeping and shipping provisions of the Act, sections 7, 11(c) and 15(a) (1), 29 U.S.C. §§ 207, 211(c) and 215(a) (1), respectively.

2. In the original Act, the exemption applicable to on-shore fishery operations, other than canning, was section 13(a) (5) which provided a minimum wage and overtime exemption for both off-shore and on-shore fishery activities. By amendment effective September 1961 Congress

During this period defendant had an arrangement with an organization of Mexican fishermen, called the Cooperativa, under which he purchased, at La Paz, Mexico, fresh fish caught off the coast of that country. The fish were picked up at La Paz by airplanes owned by defendant,[3] flown to Long Beach or such other airport as might be designated by Customs, transferred to trucks, and delivered to wholesale outlets in the Los Angeles area.

No other aircraft being available to provide the air transportation phase of this operation, defendant, in January 1961, purchased eight surplus military aircraft from the Air Force. It was necessary to modify these aircraft in substantial respects. This involved the removal of bomb racks and bomb bay equipment, closing of gun ports and bomb bay doors, installation of decks and deck blockheads, removal and capping of turrets, installation of radios, overhauling engines, and putting styrofoam under the floors which made it possible to store ice and transport perishable goods.

In making these modifications, defendant utilized hangar and ground facilities at Long Beach Municipal Airport. The twenty employees here in question, some of whom were licensed by the Federal Aviation Agency, are mechanics, mechanic's helpers, welders and sheet metal workers employed at that plant. They modified all eight planes; this work required from four to twelve months for each plane.[4] The employees put in an average of forty-five or fifty-five hours a week throughout the entire period in question.

Some of these employees also helped maintain the aircraft once they were being used for carrying fish. Some also helped transfer fish to trucks upon arrival at the Long Beach Airport. These additional activities occupied approximately eight percent of each work week for each employee while the fishery operations were in progress. However, during a substantial part of the period here in question (February 18, 1961 to May 15, 1962) there was very little fishery operation. Due to difficulties with the Cooperativa only six loads of fish were flown in from La Paz during the eight and a half months from September, 1961 through May 15, 1962. One employee, who went to work for defendant at the airport in August, 1960, testified without contradiction that he first saw a planeload of fish in the latter part of 1961 or the first part of 1962. Another employee who worked for defendant from February to August, 1962, stated that he never saw a load of defendant's fish come into the airport.

During the period for which defendant claimed the fisheries exemption, these employees also worked on ten other aircraft which were not used in the fishing business and which apparently did not belong to defendant. No evidence was introduced as to what this work consisted of or how much of the employees' time was so occupied.

█ The Secretary concedes that to the extent these employees serviced airplanes which were transporting fish, and helped in the unloading of fish at the airport, they were engaged in the "marketing" and "distributing" of fish, within the meaning of the section 13(b) (4) exemption. Under the undisputed testimony, however, such duties occupied no more than eight percent of their time and, in many workweeks appear not to have been performed at all. The performance of this small amount of concededly exempt work would not entitle defendant to claim the exemption. The performance of any substantial amount

---

transferred on-shore activities to section 13(b) (4) which is an overtime exemption only. Defendant pleaded section 13 (a) (5) as a defense for the period prior to September 1961. We shall hereafter refer only to section 13(b) (4), as did the trial court.

3. Defendant eventually established a refrigeration plant at La Paz.

4. Only four or five of these planes were actually used in defendant's fishery operations.

of nonexempt work in any workweek defeats an otherwise applicable exemption.[5]

The district court understood this and did not rest its holding on the small amount of concededly exempt work which was performed. Indicating that it also regarded as exempt the work performed in modifying airplanes for use in the fish operation, the court found that, during the period in question, these employees " * * * spent not less than eighty per cent of each workweek in activities that were necessary to the conduct of the operation of said fishing business of defendant."

■ The section 13(b) (4) exemption is not confined to workmen who come into physical contact with the fish being canned, processed, marketed, frozen, cured, stored, packed for shipment or distributed. It also includes workmen who are substantially engaged in work which is necessary to the performance of these activities conducted by their employers. See Mitchell v. Trade Winds Company, 5 Cir., 289 F.2d 278, 282; McComb v. Consolidated Fisheries Co., 3 Cir., 174 F.2d 74, 78; Waller v. Humphreys, 5 Cir., 133 F.2d 193, 194.[6]

But the concept "work necessary to these activities" is inherently imprecise and is capable of either a narrow or an expansive interpretation. The structural modification of airplanes was necessary to defendant's fishery operations in the sense that he required air transportation and this was the only way he could obtain usable airplanes. So, too, we suppose, the work of constructing fishing vessels performed by employees of the person who needed them for fishing could be said to be work necessary to the fishing operation if these vessels could not be obtained in any other way.

This broad view of the exemption, however, finds no support in the cases called to our attention which have announced and applied the "work necessary to the activities" principle. In McComb, for example, by application of this concept, a night watchman, a cook, an office employee, and several carpenters and maintenance men employed at or in connection with the employer's fish processing plant, were held to be performing work necessary to the fish processing operation and so covered by the exemption. In Waller, giving effect to this principle, the court included within the exemption employees of a fish processing plant who served as nightwatchmen, raised the steam in the boilers early each morning, and blew the whistle calling other workmen to their duties.

It is our view that, in applying the principle that work necessary to the exempt activity is exempt, a line should be drawn between work which is a normal and recognized incident of the exempt activity, and that which is not. It is reasonable to assume that Congress intended to extend the exemption to work customarily or frequently associated with the exempt activity. It does not seem likely that Congress intended to extend the exemption beyond this to cover work which, although necessary

5. See Mitchell v. Hunt, 5 Cir., 263 F.2d 913, 917; Mitchell v. Stinson, 1 Cir., 217 F.2d 210, 217; Tobin v. Blue Channel Corp., 4 Cir., 198 F.2d 245, 248. See, also, 29 C.F.R. § 784.116 (1965).

6. In its report on H.R. 3935 which became the Fair Labor Standards Amendments of 1961 (see note 2, above) the Senate Committee on Labor and Public Welfare indicated its approval of this principle. The Committee said, in part:
"The present exemptions in sections 13(a) (5) and 13(b) (4) have been judicially interpreted to apply to all employees employed in the seafood industry including any employee who participates in activities which are necessary to the conduct of the operations specifically described in the exemptions. (McComb v. Consolidated Fisheries Company, 174 F.2d 74, C.A.3, 1949). These interpretations are consistent with the congressional purpose of treating all employees of one establishment in the same manner under the act and of avoiding segmentation as between different employees of the same employer engaged in the named operations." S. Rep.No.145, 87th Cong., 1st Sess. 33 (1961), U.S.Code Cong. & Admin.News 1961, p. 1652.

to the enterprise under the peculiar circumstances of a particular case, is ordinarily disassociated with the exempt activity.

In so holding, we have not overlooked the statement in the Senate Committee report (note 6 above), the segmentation between different employees of an employer engaged in an exempt operation is to be avoided. The Committee's reference to the *McComb* case, however, leads us to believe that what the Committee had in mind was segmentation of employees of the type involved in that case —a nightwatchman, cook, office employee, carpenters and maintenance men —who are directly and necessarily involved in fish processing. We doubt that the Committee would have regarded it as undesirable "segmentation" if the court in *McComb* had excluded from the exemption workmen of that fish processor engaged in constructing required new buildings on the plant site, even assuming no other means of constructing them were available.[7]

In *Waller* as well as in *McComb*, the work held to be exempt was a normal and recognized incident of the exempt activity. This cannot be said of the mechanical, sheetmetal, welding and other work entailed in structurally modifying airplanes so that they could be used to transport fresh or frozen fish. We accordingly hold that the workmen in question were not covered by the fisheries exemption of the Act during the period from February 18, 1961 to May 15, 1962.

This brings us to the second branch of the case, involving the trial court's findings and conclusions to the effect that these twenty employees were covered by the retail establishment exemption during the period from May 15, 1962 to February 18, 1963. Insofar as here pertinent, this exemption, contained in section 13(a)(2), provides that section 6, relating to minimum wage, and section 7, relating to overtime, shall not apply to:

" * * * any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, * * *. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * * *." 29 U.S.C. § 213(a)(2).[8]

On or about May 15, 1962, after the Mexican Government had closed down defendant's fish operation in Mexico, he operated an aviation repair station at the Long Beach Airport. Pursuant to this

---

7. In this connection it is worthy of note that section 13(b)(4), unlike certain other exemptions provided for in the Act, is phrased in terms of "any employee employed in" certain named activities, and its application therefore depends upon the character of the employee's work, rather than the identity of the employer. See Mitchell v. Trade Winds Co., 5 Cir., 289 F.2d 278, 282. Compare section 13(a)(9) ("any employee of a street, suburban or interurban electric railway * * *"), section 13(a)(12) ("any employee of an employer engaged in the business of operating taxi cabs"), section 13(b)(2) ("any employee of an employer subject to the provisions of part I of the Interstate Commerce Act"), section 13(b)(3) ("any employee of a carrier by air * * *").

8. Section 13(a)(4), which qualifies section 13(a)(2) to some extent, reads as follows:
   "§ 213. Exemptions.
   * * * * * * *
   "(4) any employee employed by an establishment which qualifies as an exempt retail establishment under clause (2) of this subsection and is recognized as a retail establishment in the particular industry notwithstanding that such establishment makes or processes at the retail establishment the goods that it sells: *Provided*, That more than 85 per centum of such establishment's annual dollar volume of sales of goods so made or processed is made within the State in which the establishment is located; * * *." 29 U.S.C. § 213(a)(4).

plan, he entered into a lease with the City of Long Beach for two hangars and two acres of "tie-down" space. About the same time he applied for a Federal Aviation Agency license to operate an aviation repair station, which license was issued about February 15, 1963. As required by the licensing regulations of that agency, his establishment included a machine shop, equipment for lathing and sheet metal work, and welding facilities. The twenty employees referred to above constituted the working force in this operation, continuing their usual duties as welders, mechanics, sheet metal workers and helpers.

The character of defendant's business during this period was established mainly by an exhibit submitted by him stating income received for the year from February 18, 1962 to February 18, 1963. According to these figures, about fifty-eight percent of his gross income ($57,390 out of a total of $99,214) was derived from the modification of seven or eight aircraft for a single customer, Cisco Aircraft, Inc. These planes were modified for use in Cisco's forestry spraying operations in New Mexico and Montana. The modification work, which required a substantial part of the time of the twenty employees, involved converting surplus military aircraft, making tanks, and installing spray booms and other equipment. This work was performed on a time and material basis.

In addition to the Cisco Aircraft job, appellant argues that the following comparable work performed by defendant was nonretail: for $1,299, a B–26 was modified for Tallmantz Aviation for use in commercial aerial photography; for Art Holst ($1,291) and Harold Jordan ($1,000) two aircraft were modified and rebuilt for their individual use.[9]

There is also evidence that during the period in question some parts were made to order,[10] and some planes were repaired, overhauled and maintained. However, the annual dollar volume of the sales of goods and services of this character fell far short of the seventy-five percent provision of section 13(a) (2). Thus even assuming that, as to these goods and service, the other statutory retail establishment criteria apply, these miscellaneous sales would not be sufficient, standing alone, to qualify defendant for that exemption.

The correctness of the district court's determination must therefore stand or fall on whether the character of the sales made to Cisco Aircraft, Inc., Tallmantz Aviation, Holst, Jordan and Weiner, entitle defendant to classification as a retail establishment within the meaning of section 13(a) (2) and (4). Indeed, since the sales to Cisco Aircraft, Inc., alone account for fifty-eight percent of defendant's gross income defendant cannot prevail unless the Cisco transactions fall within the retail category.

Under a literal reading of section 13 (a) (2), a "retail service establishment" is an establishment seventy-five percent of whose annual dollar volume of sales of goods or services meets both of two tests. One of these is that such sales are not for resale. The sales to Cisco were clearly not for resale, and so this first test was met.

The other is that such sales are "recognized as retail sales or services in the particular industry." To prove that this second test was also met, defendant produced the testimony of James Conroy, who has been in the aviation industry for thirty-one years, and who was the service manager of a similar business. He testified that he understood establishments such as defendant's to be "generally recognized as retail in the industry." Further elaborating, he expressed the opinion that all sales "to the user or owner" were recognized as retail

9. Appellant also contends, and appellee concedes, that the work of modifying several planes for relicensing and eventual resale, performed for E. O. Weiner for a charge of $4,581, was nonretail.

10. Defendant did almost no business in the sale of stocked aircraft parts.

in the aircraft business or aviation industry. It is fair to assume that Conroy would so classify the sales defendant made to Cisco. Plaintiff produced no testimony as to whether the operation of aviation repair stations in general, or defendant's in particular, or the particular sales made to Cisco were or would be recognized as retail in the aviation industry.

The district court, accepting this literal construction of section 13(a) (2), and finding that the sales were not for resale and, on Conroy's testimony, that they were recognized as retail sales or services in the aviation industry, held the exemption applicable.

In Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694, affirming the opinion of this court reported at 335 F.2d 952, the Supreme Court refused to give section 13(a) (2) such a literal reading. Relying on what it found to be the most persuasive legislative history and concluding that a contrary view would compel results inconsistent with those Congress contemplated, the Supreme Court rejected industry usage as conclusive.[11]

Having rejected the industry usage test as the single touchstone, the Supreme Court discussed the meaning to be given to the term "retail." The Court indicated that the first inquiry should be whether the sale of the particular type of goods or services in question could ever qualify as retail whatever the terms of sale. Only if the answer to this question is affirmative, the Court said, is it necessary to determine the terms or circumstances that make a sale of those goods or services a retail sale.

The typical retail transaction, the Court stated, is one involving goods or services that are frequently acquired for family or personal use.[12] The Court went on to point out that sales of such goods or services can be retail whether made to private householders or to business users, but added: "* * * but the goods and services listed nearly all share the common characteristic that they are often purchased by householders."

The Supreme Court recognized in its opinion, however, that Congress also intended the retail exemption to extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use. The Court listed farm implements and small trucks as examples of goods falling in this category. The Supreme Court stated that it could not draw a precise line between such articles and those like industrial machinery which can never be sold at retail. But the Court called attention to the following characteristics of such items as small trucks and farm implements, which offer some guidance: (1) their employment is very widespread as is that of consumer goods; (2) they are often distributed in stores or showrooms and by means not dissimilar to those used for consumer goods; and (3) perhaps it can be said that they are frequently used in commercial activities of limited scope. Finally, the Court observed, "* * * the list of strictly commercial items whose sale can be deemed retail is presumably very small * * *."[13]

11. Our decision in *Idaho Sheet Metal Works, Inc.*, was rendered after the judgment had been entered in the case before us. The decision of the Supreme Court therein was rendered after the oral argument on this appeal. We called for, and received, supplemental briefs commenting on that decision.

12. As examples of sales that could qualify as retail, the Supreme Court referred to the House Conference Report which lists sales made:
   "'* * * by the grocery store, the hardware store, the coal dealer, the automobile dealer selling passenger cars or trucks, the clothing store, the dry goods store, the department store, the paint store, the furniture store, the drug store, the shoe store, the stationer, the lumber dealer, etc. * * *'. House Conf.Rep., p. 25 (sale of farm machinery is another example given)." 383 U.S. at 203, 86 S.Ct. at 746.

13. The Court also made the following qualifying statement:
   "Within the category of goods and services that can be sold at retail, naturally not every sale can be so classi-

In the light of the premises thus established, the Supreme Court held that since more than twenty-five percent of the dollar volume of sales made by Idaho Sheet Metal Works derived from the fabrication, installation and maintenance of sheet metal products consisting of vats, storage tanks, hoods and the like for use by five potato processing companies, Idaho Sheet Metal Works was disqualified as a retail establishment.[14]

■ Applying to the case before us the analysis made by the Supreme Court in the *Idaho Sheet Metal* case, the conclusion is inescapable that defendant is not entitled to the retail establishment exemption. Approximately fifty-eight percent of its sales during the year commencing February 18, 1962, were derived from the work of structurally modifying seven or eight aircraft for Cisco Aircraft, Inc., so that the planes could be used in Cisco's forestry spraying operations. Needless to say the service thus performed and the goods thus sold were not of a kind which is often the subject of a "typical retail transaction," as the Supreme Court explains that term.

. Nor do they fall in that limited category of strictly commercial items, such as small trucks and farm equipment which, the Supreme Court said, may also be encompassed by the retail exemption. They have none of the characteristics listed by the Supreme Court as differentiating the sale of small trucks and farm implements from the sale of clearly nonexempt items such as industrial machinery. On the contrary, they have the same characteristics as those of the sales which led the Supreme Court to deny exempt status to Idaho Sheet Metal

Works, Inc., as listed in note 14. Under these circumstances, testimony of industry usage, which is no firmer here than in the *Idaho Sheet Metal* case, cannot save defendant from nonexempt status.

Reversed.

fied. The exemption itself excludes any sale for resale and beyond that, reference in the legislative history, n. 14, supra, and common parlance certainly suggest that the term retail becomes less apt as the quantity and the price discount increases in a particular transaction."

14. Explaining this conclusion, the Court said:
"The type of equipment described plainly appears to have no private or non-

commercial utility. Nor does it bear much resemblance to those strictly commercial articles earlier named that may be sold at retail. Unlike small trucks and farm equipment, the market for these goods is highly limited, and far from being stock items purchased off the shelf, these articles were generally fabricated to meet individual specifications." (Footnote omitted.)