James D. **HODGSON**, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**SUGAR CANE GROWERS COOPERATIVE OF FLORIDA, and Robert Lee, Defendants.**

No. 71-930-Civ-CF.

United States District Court. S. D. Florida. July 19, 1972.

John R. Beranek, of Jones, Paine & Foster, P. A., West Palm Beach, Fla., for defendants.

Beverley R. Worrell, Regional Sol., Dept. of Labor, Atlanta, Ga., for the Department of Labor.

## MEMORANDUM OPINION

FULTON, Chief Judge.

This is an action by James D. Hodgson, Secretary of Labor, against the Sugar Cane Growers Cooperative of Florida under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. This cause was tried before the Court without a jury. The facts in this matter were largely stipulated.

## FACTUAL BACKGROUND

The defendant Sugar Cane Growers Cooperative is involved in the growing, harvesting, and processing of sugar cane from lands located in Palm Beach County, Florida. This operation is large and complex; among the many employees of the defendant are the boiler workers and the camp cooks and attendants. This case concerns the overtime pay of these two categories of workers; the defendant has agreed that it has not paid these employees overtime pay when said employees have worked over forty hours in any given week. Although, with regard to the boiler workers, it was further agreed that overtime (time and a half) is paid when the boiler worker works over 48 hours in any week.

## CAMP COOKS AND ATTENDANTS

The camp cooks and attendants are employed by the defendant Cooperative in connection with the operation of four labor camps and cafeterias in which the Cooperative's off-shore West Indian agricultural laborers are housed and fed while they are in this country. The camp cooks prepare these West Indian worker's meals; the attendants maintain and clean their barracks.

The testimony of George Wedgworth, which was undisputed, showed that the West Indian off-shore laborers came into this country for sugar harvesting only by virtue of an extremely structured program which has the approval and is under the supervision of the United States Department of Labor, the United States Department of Agriculture and the Government of Jamaica. Mr. Wedgworth testified that these workers are allowed in this country on a temporary basis only on the condition that the defendant supply their housing and food.

The bulk of the West Indian workers are not involved in this suit, and there is no contention that they have been improperly paid. However, the camp cooks and attendants are also West Indians and are admitted to this country along with the laborers. The clearance orders for the camp cooks, which were admitted into evidence, are issued by the Department of Labor and are entitled "Clearance Order for Agricultural Labor." The attendants come into this country under the general clearance order admitting all the laborers. The Department of Labor permits that out of those certified for agricultural labor certain workers may be used to care for the required living quarters.

Although in the past the Department of Labor has required the defendant to utilize U. S. citizens as camp cooks on an experimental basis, this experiment did not work. The workers wanted food prepared in the manner to which they grew accustomed in their homeland. Because this was apparently essential to the morale of the laborers, the defendant was permitted to return to using West Indian cooks.

## BOILER WORKERS

As stated, the defendant Cooperative plants, harvests, and processes raw sugar cane. The Glades Sugar Mill, which is defendant's sugar processing mill, has a capacity of processing in excess of eight thousand tons of sugar cane per day.

In the processing of sugar cane, heat is needed for the heating, evaporating, and crystalization of crushed cane juice into sugar crystals. The mill site's steam generating plant or boiler room, where the workers in question work, produces this essential steam heat, which in turn provides energy to two sources within the plant. Schematically 40% of the steam produced in the steam generating plant goes to the plant's mill turbines; these mill turbines drive the mill crushing machinery which pulverizes the cane and squeezes out the juice. Sixty percent of the steam produced by the steam generating plant goes to the plant's electrical power plant. There are 3 turbogenerators contained in this electrical power plant. "Exhaust steam" is the steam left after the propulsion of the electrical generators has occurred. All of the "exhaust steam" from turbo-generator # 1 and # 2 is sent to the boiling

house of the sugar mill. Turbo-generator # 3 also produces exhaust steam; however, this exhaust steam is mechanically and temporarily diverted to an adjacent processing plant owned by the Quaker Oats Company.

This adjacent plant has been in operation since 1966. The defendant Co-op and the Quaker Oats plant are corporately and physically unconnected except by a series of conveyors and steam pipes. The Quaker Oats plant produces "furfurol," which is an amber colored liquid used primarily in the production of plastics, adhesives, abrasives, motor oils, and other varied products. Under a contractual agreement between Quaker Oats and the defendant Co-op, the Co-op sells both the exhaust steam from turbo-generator # 3 and a substance called "bagasse" to Quaker Oats.

Bagasse is a pulpy residue obtained from crushing cane in the sugar industry; bagasse is ordinarily used as the primary fuel to fire the boilers in the steam generating plant. In this instance, because of the existence of the contract between Quaker and the defendant, all the bagasse produced by the Co-op is sold to Quaker, used in its furfurol production process, and then returned to the Co-op. Thus, the basic fuel used in the Co-op's operation is bagasse produced furfurol residue.

The exhaust steam mechanically sent to Quaker from turbo-generator # 3 is also ultimately returned to the defendant Co-op. Of the steam coming from turbo-generator # 3, approximately 36%, in terms of BTUs, is sent to the Quaker plant. After utilization in the furfurol process, approximately 26–31%, in terms of BTUs is returned to the defendant. Thus, there is a total BTU loss through this diversion of 5–10%.

This lengthy explanation of the sugar mill's operation, the furfurol plant's operation, and the contractual arrangement between Quaker and the defendant is necessary because the boiler workers in question are the persons who operate and maintain the sugar plant's boiler room or steam generating plant. Because a minimal amount of the total steam produced by the boiler operation and sent to the electrical power plant is ultimately temporarily diverted to Quaker Oats, the plaintiff Department of Labor contends these employees are performing work for both the Co-op, an exempt operation, and Quaker Oats, a non-exempt operation, and that these employees should therefore not be exempt from coverage under the Fair Labor Standards Act.

The boiler employees in question operate in three shifts. The day shift consists of 5 men—boiler foreman, operator, operator's helper and mechanic, mechanic's helper, and a laborer. The other shifts may not have a mechanic or mechanic's helper. The sole function of the boiler employees is the manufacture of steam. The diversion of the steam to the several destinations is done automatically. It can also be done manually, but only by a receiving operator—not by any boiler worker. The boiler workers do not work for Quaker Oats; they never go to the Quaker plant and they are, in fact, prohibited from going to the furfurol plant. These workers also have nothing to do with the determination of how much exhaust steam is diverted to Quaker.

Most significantly, if Quaker were to today cease operations, the boiler workers would continue to perform the very same functions both as to their work-load and the hours worked. The only change would be in the fuel used to fire the boilers—bagasse would be used rather than bagasse produced furfurol residue.

It should also be noted that, at most, 15 workers are in question herein. Furthermore, the arrangement between Quaker and the Co-op is the only one of its kind in the world, making this a unique situation involving a minimal number of persons.

## THE ACT AND EXEMPTIONS CLAIMED

Title 29 U.S.C. § 207(a) (1) provides:
Except as otherwise provided in this section, no employer shall employ any

of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

There are certain exemptions from the Act, however, and the defendant claims that these two categories of employees fall within one or more of these exemptions. It is claimed that the boiler employees fall within both the processing exemption, 29 U.S.C. § 213(b) (15), and the seasonal industry exemption, 29 U.S.C. §§ 207(c), 207(d). It is further claimed that the camp cooks and attendants fall within the agricultural exemption, 29 U.S.C. § 213(b) (12), the food exemption, 29 U.S.C. § 213(b) (18), and the seasonal industry exemption, 29 U.S.C. §§ 207(c), 207(d).

The *Seasonal Industry exemption,* §§ 207(c) and 207(d), which defendant contends applies to both categories of employees in question, provides:

(c) For a period or periods of not more than ten workweeks in the aggregate in any calendar year, or fourteen workweeks in the aggregate in the case of an employer who does not qualify for the exemption in subsection (d) of this section, any employer may employ any employee for a workweek in excess of that specified in subsection (a) of this section without paying the compensation for overtime employment . . . if such employee (1) is employed by such employer in an industry found by the Secretary to be of a seasonal nature . . . .

(d) For a period or periods of not more than ten workweeks in the aggregate in any calendar year, or fourteen workweeks in the aggregate in the case of an employer who does not qualify for the exemption in subsection (c) of this section, any employer may

employ any employee for a workweek in excess of that specified in subsection (a) of this section without paying the compensation for overtime employment prescribed in such subsection, if such employee—

(1) is employed by such employer in an enterprise which is in an industry found by the Secretary—

(A) to be characterized by marked annually recurring seasonal peaks of operation at the places of first marketing or first processing of agricultural or horticultural commodities from farms if such industry is engaged in the handling, packing, preparing, storing, first processing, or canning of any perishable agricultural or horticultural commodities in their raw or natural state, or

(B) to be of a seasonal nature and engaged in the handling, packing, storing, preparing, first processing, or canning of any perishable agricultural or horticultural commodities in their raw or natural state, . . . .

The *Processing exemption,* which the defendant contends is applicable to the boiler employees is found in 29 U.S.C. § 213(b) (15). It provides:

(b) The provisions of section 207 of this title shall not apply with respect to—

(15) any employee engaged in . . the processing of sugar beets, sugar-beet molasses, sugarcane, or maple sap, into sugar . . . .

The *Agricultural exemption,* 29 U.S.C. § 213(b) (12), which defendant alleges applies to the camp cooks and attendants provides:

(b) The provisions of section 207 of this title shall not apply with respect to—

(12) any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and

which are used exclusively for supply and storing of water for agricultural purposes.

Finally, defendant alleges that the *Food exemption,* 29 U.S.C. § 213(b)(18) applies to the camp cooks and attendants. Subsection (b)(18) provides:

> (b) The provisions of section 207 of this title shall not apply with respect to—

> (18) any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests of members of clubs;

## APPLICABILITY OF EXEMPTIONS TO BOILER WORKERS

The nature of the boiler operation and the boiler workers' duties have been outlined earlier in this opinion. The plaintiff Department of Labor urges that these boiler employees are not entitled to the exemptions provided in 29 U.S.C. §§ 207(c) and 207(d) and 29 U.S.C. § 213 (b)(15) because these workers are allegedly performing duties for both an exempt operation, the Co-op, and a non-exempt operation, Quaker Oats. Were the Quaker Oats furfurol plant to close or if it did not exist, the plaintiff has conceded that these workers would clearly come within these exemptions. However, the plaintiff has reasoned that the steam produced by these employees is a vital element of both operations and that, therefore, the boiler workers are "employed" in both operations. The Department of Labor contends this even though testimony revealed that 1) the workers do no more in terms of work-load, work-hours, or nature of work than would be done if Quaker were not next door, 2) the boiler workers are not paid by Quaker nor are they ever permitted inside the Quaker plant, 3) the boiler workers have nothing to do with the diversion of steam to Quaker and that such diversion is purely mechanical, and 4) the total amount of steam used by Quaker is a miniscule amount of the exhaust steam which comes indirectly from the boiler operation.

Although an employee engaged in both exempt and non-exempt activities cannot qualify for the exemptions, Guess v. Montague, 140 F.2d 500, 504 (4th Cir. 1943); Collins v. Kidd Dairy & Ice Co., 132 F.2d 79 (5th Cir. 1942); Davis v. Goodman Lumber Co., 133 F.2d 52 (4th Cir. 1943); Wabash Radio Corp. v. Walling, 162 F.2d 391 (6th Cir. 1947); Wirtz v. Carstedt, 362 F.2d 67 (9th Cir. 1966), in this instance there has been no showing that the boiler workers are engaged in any non-exempt activities. The plaintiff has relied heavily upon Walling v. Connecticut Co., 154 F.2d 552 (2nd Cir. 1946), aff'g 62 F.Supp. 733 (D.Conn.1946). In *Walling,* the defendant operated electric trolley cars. It also operated a power plant engaged in the production and sale of electric power. The Court therein found that the 40–45 powerhouse employees were not exempt under the Act's local trolley or motor bus exemption because the employer was also engaged in the production and sale of electrical power in competition with other local power companies whose employees were covered by the Act. The District Court opinion stated:

> If the employer regularly and substantially engages in an otherwise non-exempt business other than the one for which the exemption was designed . . . strict construction of the exemption requires that it be not extended to that other business merely because the principal business of the employer is exempted. To do so would hardly be fair to those who must compete in that other business as their major activity.

> Here a substantial proportion of the power produced is sold for use in commerce outside the trolley lines, in competition with employers whose employees are covered by the Act.

The *Walling* case is distinguishable in several respects, however, from the case before this Court. First, the powerhouse employees did, as a matter of fact, perform additional duties because of the employer's adjunct operation. It was not a matter of using excess power produced of necessity which would otherwise create a disposal problem. More power than was needed for the trolley operation was purposely produced. Second, the employer itself was engaged in the non-exempt activity accounting for approximately 20% of its earnings. Third, the Court considered the competition factor—that the employer defendant did not pay overtime to employees who performed the same functions as employees of competitors who did come within the Act.

In this instance, the employer is not engaged in any non-exempt activities. These boiler employees do not perform any activity they would not perform were Quaker Oats not next door nor do they work any extra hours because of Quaker. Nothing extra is produced for Quaker. Furthermore, to bring these boiler workers within the Act would have the opposite effect it had in Walling—it would put the defendant at a competitive disadvantage.

 Finally, it appears that the Department of Labor seeks to deny the exemptions because of the *employer's* activities. Reference to § 213(b) (15) discloses that the processing exemption applies to "any employee." The exemption does not relate to the "employer." Prior to the 1966 amendments to the Fair Labor Standards Act, 29 U.S.C. § 207 (c) provided for a sugar cane processing exemption where the "employer" was engaged in the first processing of sugar cane. In 1966 this exemption was abolished and relocated at 29 U.S.C. § 213(b) (15), and was re-worded to apply to work performed by the employee rather than to the type of work being carried out by the employer. When viewed in light of this statutory background it is absolutely clear that the Department of Labor is taking a pre-1966 approach to this case. The work performed must be viewed from the standpoint of the employee and the work performed by the employees in this case is clearly processing and not in the category of non-exempt activities. In looking at these employees it is clear that there is no identifiable separation, no additional work and nothing different from the work they normally do in regard to processing. In fact, the arrangement between the Cooperative and Quaker Oats disposes of the bagasse which might create a very real waste problem for the Co-op.

Because the Court is strongly of the opinion that the boiler workers perform no non-exempt activity for Quaker Oats, the Court will not discuss the *de minimus* doctrine; although, in this instance, the temporary diversion of 36% of the exhaust steam produced by one of three turbo-generators, with the ultimate loss of about only 5%, could be considered in this light. Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946); N.L.R.B. v. Kelly Bros. Nurseries, Inc., 341 F.2d 433 (2nd Cir. 1966).

## EXEMPTIONS AS APPLIED TO CAMP COOKS AND ATTENDANTS

The duties of the camp cooks and attendants have been explained at an earlier point in this opinion. Both the West Indian laborers and those West Indians who act as camp cooks and attendants are paid a wage established by the Secretary of Agriculture, under the Sugar Act, which is higher than the agricultural wage as established by the Secretary of Labor. Both the camp cooks and attendants are admitted into this country under the clearance orders for agricultural workers; although the camp cooks come under separate clearance orders, they are nevertheless cleared as agricultural workers by the Labor Department. The policy of the Department provides that of those workers certified

for agricultural work, certain ones may be used to care for the workers' living quarters.

As previously stated, maintenance of living quarters and the provision of meals is an essential part of the total operation; it is required by the Department of Labor and the Jamaican Government. Three meals a day are served to the workers. One of the three is served in the field. The employees are charged for the meals on a daily basis; although, the charges are deducted from their wages fortnightly. These charges are set by a contract between the British West Indian Central Labor Organization and the Florida Fruit and Vegetable Association.

■ The so-called Food exemption, 29 U.S.C. § 213(b) (18), which is one of the exemptions the defendant claims applies herein, has been construed to be applicable to not only "retail and service establishments," but also to establishments which may not ordinarily be considered capable of passing the abstract "retail and service" test. Hodgson v. Crotty Brothers Dallas, Inc., 450 F.2d 1268, en banc rehearing 450 F.2d 1282 (5th Cir. 1971). Crotty Brothers held that the term "retail or service," as it appears in § 213(b) (18) was used by Congress as a descriptive term—not a limiting term. These camp cooks, who prepare meals for sale to 1500 or more persons every day, must certainly be viewed as covered by the "food exemption," which by its terms applies to food services for employees as well as food services offered for sale to the public. Although the Government contends that the Crotty case was incorrectly decided, and that this exception should not apply to privately operated, non-public, non-retail cafeterias, this Court will not take upon itself to reverse the Fifth Circuit.

■ The defendant also contends that the agricultural exemption, 29 U.S.C. § 213(b) (12), is applicable to both camp cooks and attendants. Without doubt, the maintenance of the camp barracks and the preparation of meals is intertwined with the agricultural activities of the defendant and its employees. In Wirtz v. Osceola Farms Co., 372 F.2d 584, 589 (5th Cir. 1967), the Court held that the employees who transported laborers to and from the cane fields and who also brought meals to the laborers in the field were exempt under the agricultural exemption of the Act because the truck drivers' activities were "incident to the harvesting exemption." The Court stated in a footnote:

Movement of food and workers to the fields has significance and purpose only in making it possible for the harvesting activity to take place.

Likewise in this cause, the preparation of food and maintenance of barracks must be viewed as incident to the total sugar processing and agricultural operation and a necessary adjunct to it, entitling the cooks and camp attendants to the § 213(b) (12) exemption.

The Secretary tenuously complains that the sleeping and eating facilities for the laborers are not located upon the farmlands. The evidence shows that these facilities are located adjacent to and near the farmlands and that the cooks and attendants perform services which are essential to the farming, raising, and harvesting of the cane. A fact regarded by the Court as most significant in this context is the inconsistent position taken by the Secretary; although he contends that these cooks and attendants are agricultural workers for purposes of entry into this country, he changes their status for purposes of the Wage-Hour Laws.

Finally, the whole off-shore labor program is under the strict control of the Departments of Labor, Agriculture and Immigration and is subject to negotiations between the Jamaican Government and the Florida Fruit and Vegetable Association. Wages, hours, living conditions, etc, are all controlled by Government regulation and contractual agreement. Neither the Secretary nor the Court should interfere with this plan.

It should be noted that the employees in question are engaged in employment

on a purely seasonal basis. Although the seasonal exemption provided in §§ 207(c) and 207(d) may also apply, that issue has been pretermitted because of the findings and conclusions that the employees in question fall within the other exemptions in question. Thereupon, it is

Ordered and adjudged as follows:

1. This memorandum opinion shall serve as special findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P.;

2. Having found and concluded that the defendants are entitled to the various claimed exemptions, the injunctive and other relief sought by the plaintiff Department of Labor will be denied at the cost of and with prejudice to the plaintiff;

3. Counsel for the defense shall promptly prepare and submit a form final judgment; and

4. Costs will be assessed by the Clerk of this Court.